Hillsborough
No. 7033

SPENCER W. CHAMBERLIN & *a.*

v.

MARY E. CHAMBERLIN & *a.*

June 30, 1976

*Richard W. Leonard* and *William J. Groff (Mr. Groff* orally) for the plaintiffs.

*George J. Basbanes* and *Madeline McLaughlin Neilon* (of Massachusetts), by brief and orally, for the defendants.

LAMPRON, J. Bill in equity to impress a resulting trust in plaintiffs in certain premises on Dutton Road in Pelham, and for a decree that this real estate is the sole property of the plaintiffs

free and clear of any claims of the defendants. The legal title to the premises stands in the names of the plaintiffs, Spencer W. and Ruth L. Chamberlin, husband and wife, as joint tenants with rights of survivorship in "one undivided half", and in the names of the defendants, Charles S. and Mary E. Chamberlin, husband and wife, as joint tenants, with rights of survivorship, in "the other half".

Defendant Charles is the son of the plaintiffs. He did not oppose this bill. Defendant Mary has been divorced from Charles and is now Mary Tanguay. She filed an answer opposing plaintiffs' claims and seeking a partition of the property under RSA 538:1. The Trial Court *(Flynn, J.)* made findings and rulings and decreed that there was a resulting trust in favor of the plaintiffs in the half held in the names of the defendants Charles S. and Mary E. Chamberlin, now Tanguay. The latter's exceptions to the court's denial of her motions for a directed verdict, to set aside the court's decree, and for a new trial were reserved and transferred.

The following findings made by the trial court were supported by the evidence. "In 1959, the plaintiffs sold their farm in Chelmsford, Massachusetts, and netted $28,000.00 from the sale. With these funds, the plaintiffs undertook to purchase a dairy farm, including the cows and equipment, in Pelham, New Hampshire, which was owned by Christian J. Gaudette and Kathryn R. Gaudette for the sum of $40,000.00. Mr. Chamberlin planned to operate this dairy farm in partnership with his son, Charles.

"The plaintiffs originally intended to meet the purchase price ... by using the funds from the Chelmsford sale and by obtaining a mortgage of $12,000.00. When the older Mr. Chamberlin discussed this mortgage loan with an official at the Federal Land Bank, he was advised that due to the plaintiffs' ages [Spencer was then about 57], a mortgage loan might not be extended. It was suggested that a mortgage might be more easily effected if the plaintiffs' son and daughter-in-law were co-signers. As a result, the defendants, when requested, agreed to accommodate the plaintiffs by co-signing the mortgage deed and notes involved.

"On May 15, 1959, the Gaudettes conveyed the farm in question [to the four grantees in the manner hereinbefore described]. Putting the title to this property in joint tenancy was not the idea of the plaintiffs but rather that of the bank official and the lawyers.

"Of the total price of $40,000.00, the sum of $12,180.85 was received from a mortgage loan to the plaintiffs and defendants from the Federal Land Bank . . . and $5,770.00 was received as a loan to the plaintiffs and defendants from the Production Credit Association, the balance of $21,700.00 including a deposit of $300.00, being paid by funds of the plaintiffs derived from the sale of their Chelmsford farm . . . . Both of these notes were signed by the plaintiffs and the defendants."

The trial court also made these further findings which were warranted by the evidence. After the conveyance in 1959 plaintiff Spencer brought his cows, bull, tractors and other equipment from Chelmsford to the new farm in Pelham. The plaintiffs and defendants also moved to the farm. The latter occupied one half of the house rent-free and the plaintiffs occupied the other half.

The father, Spencer, and his son, Charles, operated this dairy farm in partnership until about 1965 when it was dissolved due to financial problems. The financial aspects of operating the farm were mainly under the control of the father. He and his son received $50 weekly for their services. The balance was placed in a partnership checking account from which the farm expenses, utilities, taxes and mortgage payments were paid. The paid note to the Federal Land Bank was introduced as an exhibit. Mary Chamberlin had nothing to do with the farm partnership, except that for a period of four years when Ruth Chamberlin was sick, Mary signed the checks of the partnership account along with Spencer and Charles. When the dairy business ceased, the partnership bank account was closed and the father, Spencer, opened an account of his own in which he deposited his wages as a school custodian and other funds.

A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein and where the inference is not rebutted. Restatement (Second) of Trusts § 404 (1959). Such a trust is presumed to arise when one pays the consideration for a transfer of real property but has the title taken in the name of another. *Bailey v. Scribner,* 97 N.H. 65, 68, 80 A.2d 386, 388 (1951); *Wiggin v. Peacock,* 95 N.H. 329, 332, 63 A.2d 245, 248 (1949).

When, however, the payor of the consideration is related to the grantees, there is a presumption that the transfer of the property is by way of a gift. *Shelley v. Landry,* 97 N.H. 27, 29, 79 A.2d 626,

628 (1951). This presumption is strongest when the grantee is the wife of the payor or a minor child. G. Bogert, Trusts and Trustees §§ 459, 460 (2d ed. 1964). The presumption is less strong in the case of an adult son and weaker when a daughter-in-law is involved. *Id.* § 460. In any event, the presumption can be rebutted. *Kachanian v. Kachanian,* 100 N.H. 135, 137, 121 A.2d 566, 568 (1956).

Such a purchase money resulting trust is an "intent enforcing trust" based on findings by a court that in view of the circumstances surrounding the conveyance, as revealed by the acts of the parties, a trust was intended even though language to that effect was not used. G. Bogert, Trusts and Trustees § 454, at 517-18 (2d ed. 1964). The trust arises at the time of the delivery of the deed passing title to others than the payor. It comes into being when the title vests or not at all. *Suwalski v. Suwalski,* 40 Ill. 2d 492, 495, 240 N.E.2d 677, 679 (1968); G. Bogert, Trusts and Trustees § 454, at 527 (2d ed. 1964). Hence the events which surrounded the conveyance in this case are of major importance in determining the intent of the parties. G. Bogert, *supra* § 454, at 525-26.

Plaintiffs had sold their farm which netted them $28,000 in cash. They undertook the purchase of the farm in question intending to meet the purchase price of $40,000 with their cash and by obtaining a mortgage of $12,000. At the suggestion of a bank official title to the property was taken by the plaintiffs as joint tenants with the defendants. The trial court properly found that "[p]utting the title in the property in joint tenancy was not the idea of the plaintiffs but rather that of the bank official and the lawyers." This was evidence that the plaintiffs did not intend the conveyance to be a gift to the defendants. *Shelley v. Landry,* 97 N.H. 27, 29-30, 79 A.2d 626, 627-28 (1951); *Wiggin v. Peacock,* 95 N.H. 329, 332, 63 A.2d 245, 248 (1949). Furthermore the record is devoid of evidence that the plaintiffs' financial situation was such that it is likely that they intended to make a gift of a half interest in this property. Restatement (Second) of Trusts § 443, Comment *a* (1959).

The conduct of the parties after the conveyance with relation to the possession of the realty, its benefits and burdens also corroborated the fact that a trust was intended instead of a gift. The trial court found that ten to twelve lots out of the large farm were sold. In each instance the defendants signed the deeds and endorsed checks received in payment and turned them over to the plaintiffs

with no questions asked. Plaintiffs applied this money toward the payment of the mortgage when it was outstanding. After it was paid the plaintiffs placed these funds in their own checking account without objection by the defendants. The plaintiffs reported all the profit from these sales in their joint income tax returns. The last sale of lots was on July 25, 1973, after Mary's divorce in 1972, and about seven months before these proceedings were instituted.

The obligations undertaken by the defendants as co-signers of the mortgage notes of approximately $18,000 secured by property purchased for $40,000 was not of such a nature as to negative a conclusion that they held the half interest in the farm deeded to them in trust for the plaintiffs. *See West v. Scott*, 6 Ill. 2d 167, 173, 128 N.E.2d 734, 737 (1955). Furthermore, they were exonerated from any obligation to pay any deficiency upon foreclosure when the mortgages were paid. Restatement (Second) of Trusts § 456, Comment *f* (1959). Nor does the fact that the father and son operated jointly the dairy business conducted on this farm lead to a conclusion that a resulting trust was not intended in the real estate.

We hold that the trial court properly found and ruled that the plaintiffs were the real purchasers of the property in question; that plaintiffs did not intend a gift to the defendants of an interest in the property, but rather, that they held their title in trust for the plaintiffs; and that the plaintiffs were the sole owners of the whole property free and clear of any claims of the defendants. It follows that the trial court properly denied the prayer of Mary E. Chamberlin, now Tanguay, that there be a partition of this property.

*Exceptions overruled.*

All concurred.