JULES R. CAVADI[1] *vs.* CHRISTINA M. DEYESO.[2]

Suffolk. October 5, 2010. - January 4, 2011.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.[3]

*Practice, Civil,* Action to reach and apply, Statute of limitations. *Limitations, Statute of. Massachusetts Uniform Fraudulent Transfer Act.*

Discussion of the common-law cause of action in equity to reach and apply [624-628], and of the continuing vitality of the nonstatutory action in light of enactment in Massachusetts of the Uniform Fraudulent Transfer Act, G. L. c. 109A [628-631].

In a civil, nonstatutory action to reach and apply, in which there was no question that the plaintiff creditor had a judgment against a debtor and that the creditor had been unable to execute on that judgment, the expiration of the statute of limitations contained in the Uniform Fraudulent Transfer Act (UFTA), G. L. c. 109A, § 10, did not bar the creditor from pursuing certain equitable assets of the debtor, where, with respect to one property, the title to which lay in the defendant's name, the creditor's claim, which required no proof of a fraudulent conveyance, was discrete from and not preempted by UFTA, and the judge did not abuse his discretion in concluding that the defendant held title to the property in trust as the debtor's "straw" [631-632]; likewise, with respect to a second property, title to which was also in the defendant's name, the judge did not abuse his discretion in determining that the debtor held an interest equal to the amount he contributed toward its purchase [632-635]; however, with respect to a third property that the debtor had owned in his own name and had transferred to the defendant as a matter of public record, the theory of the action was fraud by the debtor on the creditor, and therefore, the statute of limitations set forth in UFTA applied [635-636].

CIVIL ACTION commenced in the Superior Court Department on June 16, 2004.

The case was heard by *Robert C. Cosgrove,* J.

The Supreme Judicial Court granted an application for direct appellate review.

[1]Individually and as assignee of the Federal Deposit Insurance Corporation (FDIC).

[2]Individually and as trustee of University Trust and as trustee of the 400-404 K Street Realty Trust.

[3]Chief Justice Marshall participated in the deliberation on this case prior to her retirement.

*Evan T. Lawson (Michael Williams* with him) for the defendant.

*Floyd H. Anderson* for the plaintiff.

SPINA, J. This action requires us to consider whether a non-statutory action to reach and apply permits a creditor to pursue equitable assets of a debtor after the statute of limitations contained in G. L. c. 109A, § 10, has run. Jules R. Cavadi, both individually and as assignee of the Federal Deposit Insurance Company (FDIC), holds a 1991 agreement for judgment and an execution against Stephen C. Barnes. Cavadi brought suit on that judgment, asserting that certain properties located on Martha's Vineyard (Vineyard) and in the South Boston section of Boston, as well as Stratham, New Hampshire, actually are assets of Barnes although they are held in the name of Christina DeYeso, Barnes's romantic partner, the mother of his three children, and the defendant in this action.[4] In his complaint, filed in 2004, Cavadi asserted claims against the three properties, both under the common law (reach and apply) and under G. L. c. 109A, the Massachusetts enactment of the Uniform Fraudulent Transfer Act (UFTA). Before trial, Cavadi filed a motion for lis pendens against the Vineyard property, which DeYeso contested by means of a special motion to dismiss pursuant to G. L. c. 184, § 15. The motion judge found that Cavadi's claim under UFTA is barred by the four-year statute of limitations in G. L. c. 109A, § 10.[5] DeYeso subsequently moved for summary judgment regarding Cavadi's common-law claims, arguing that UFTA provides an exclusive statutory remedy and that all claims accordingly are governed by the four-year statute of limitations in § 10. Summary judgment was denied by a second judge in the Superior Court and the action proceeded to trial before a third judge.

After a jury-waived trial, the judge found that Barnes fraudulently transferred the South Boston property to DeYeso, that Barnes has an interest in the New Hampshire property by virtue of his contribution to its purchase price, and that DeYeso holds the Vineyard property in trust as Barnes's "straw." The judge then ordered entry of judgment setting aside the transfer of the South Boston property, declaring Barnes to have a $98,854

---

[4] Barnes was also, but is no longer, a defendant in this action. An agreement for separate judgment and execution was docketed on July 18, 2006.

[5] In contrast, an action on a judgment may be commenced any time within twenty years of the judgment. G. L. c. 260, § 20.

interest in the New Hampshire property, and declaring the entirety of the Vineyard property to be held in trust on Barnes's behalf. DeYeso appeals from the judgment and from the judge's valuation of Barnes's interest in the properties. For the reasons that follow, which differ from those of the trial judge, we affirm the judgment as to the Vineyard and New Hampshire properties, but reverse the judgment as to the South Boston property.

1. *Facts.* We take the following facts from the findings of the judge, supplemented by details drawn from testimony where indicated and documentary evidence in the record. On September 17, 1991, an agreement for judgment was entered in the Superior Court that provided that judgment "shall enter as against [Barnes] . . . in the amount of $753,384.78 in favor of [the] FDIC." Cavadi's complaint alleges that he was individually a creditor under this judgment because he and the FDIC's predecessor-in-interest were "joint venture partner[s]" in collecting a promissory note due to Cavadi. Following entry of judgment, execution was issued but the FDIC took no effective action to collect it. Cavadi subsequently took assignment of the FDIC's interest and now claims the benefit of the entire judgment along with interest accruing at the statutory rate since 1991. It is undisputed that Cavadi has been unsuccessful in enforcing execution on his judgment against Barnes.

The total value of the judgment against Barnes, including post-judgment interest, now exceeds $2 million, and this debt to Cavadi appears to be but one of several owed by Barnes to various creditors. Cavadi alleges that there are equitable assets of Barnes that cannot be reached at law because they are held in DeYeso's name. Because of the allegation that Barnes and DeYeso conspired to hide Barnes's assets from creditors, the relationship between the two was the subject of substantial dispute before the trial judge. That the exact nature of their personal and financial relationship remains obscure even after trial appears to be the result both of design and of their total lack of credibility.[6]

Barnes and DeYeso met in the early or mid 1980's. They have three children together, born in 1991, 1992, and 1999, and

---

[6]Barnes testified at trial and the judge did not believe his testimony. DeYeso was found to be unavailable and partial transcripts of her deposition testimony, which the trial judge also found to be unbelievable, were introduced into the record.

testimony indicated that at some points DeYeso has gone by the name "Christine DeYeso Barnes." Barnes testified that their relationship was "on and off" over the years but his former business partner testified that Barnes lived with DeYeso continuously and was never separated from his family. The couple vacations together and Barnes has kept his Ferrari automobile and his boat at DeYeso's property.[7]

Public evidence of their "volatile" relationship can be found in DeYeso's paternity and child support actions begun in Massachusetts after the birth of their second child and in New Hampshire after the birth of their third child. As a result of those actions Barnes is obligated to provide DeYeso with support that, in the language of the couple's New Hampshire stipulation, "is a substantial increase over the amount mandated" by guidelines reflecting the fact that Barnes "wants to . . . pay extra support for the benefit of his three children." Barnes is substantially in arrears in his payment of child support, and DeYeso has sought to hold him in contempt. The record demonstrates, however, that Barnes provides substantial support to DeYeso by means of credit cards billed to Barnes's corporations, checks made out to DeYeso from such corporations, and various transactions between Barnes's businesses and entities controlled by DeYeso. Indeed, the judge found that Barnes and DeYeso engaged in "any number of transactions designed to move assets from him to her without leaving a paper trail." Although the judge declined to find that the child support orders were collusive, the overwhelming impression is that transactions between DeYeso and Barnes were not entirely aboveboard.

Cavadi's action focuses not on specific transactions, however, but on present ownership of the properties that he seeks to reach and apply. The importance of this distinction is a subject of our analysis. Accordingly, it is necessary to describe the circumstances by which DeYeso acquired title to each of the properties in question.

*The Vineyard property.* In approximately 1982 Barnes and John Humbert, one of Barnes's business partners, purchased a property on Pease Point Way in Edgartown. The tenure of joint

_____

[7]Barnes appears to have possessed a number of luxury items over the years that he testified were either owned by corporations, security on loans, given to a "Mr. Diaz" (discussed *infra*), or otherwise not held in Barnes's name.

ownership is unclear, but Humbert testified that he and Barnes had a falling out over business matters in 1986 and the record indicates that by 1987 Barnes had become the sole owner of the property. In 1990 Barnes conveyed the property to a Francis Barton who may or may not have been a straw for Barnes. Barton subsequently conveyed the property to a "Raymond Diaz" as trustee of the "Pegasus Trust."[8]

In 1992, Citizens Bank had secured a judgment against Barnes and in March, 1999, a default judgment entered against "Diaz" declaring that Barnes was the true owner of the Vineyard property. Shortly after the default judgment, and supported by an affidavit from "Diaz," DeYeso sought to intervene in the proceeding as the true owner of the property. A judge in the Superior Court found that her affidavit, like the affidavit of "Diaz," was "riddled with contradictions and inconsistencies," was not credible, and required the conclusion that DeYeso "was fully involved in a scheme to shield the [Vineyard] property from Citizens Bank's claims."[9]

With DeYeso's intervention unsuccessful, the process of seizing and selling the property went forward. "[I]n a panic," DeYeso telephoned one of Barnes's business partners reporting that the bank was going to take the house and that she needed to make a deposit in order to bid on the property. The partner wired $25,020 from a company fifty per cent owned by Barnes (through various offshore entities) to an Edgartown National Bank account maintained by DeYeso. There was testimony that Barnes's capital account with the company was subsequently credited for the $25,020. Previously, on June 23, 1999, the business partner had wired $45,020 from the same company to DeYeso's account.

---

[8]The judge found that Barton sold the property to DeYeso. The recorded instruments entered into evidence, however, do not show DeYeso's name appearing in relation to the Martha's Vineyard (Vineyard) property prior to 1999 and the deed by which Citizens Bank took title to the Vineyard property states that Barton's grantee was "Raymond Diaz, Trustee of Pegasus Trust." The relationship between DeYeso and Diaz is discussed *infra* and need not be further examined for these purposes as we do not rely on the identity of the 1992 purchaser in reaching our holding.

[9]One of Barnes's former business partners testified that he recognized the signature on the Diaz affidavit as Barnes's handwriting. After comparing Barnes's known handwriting and the signature on the affidavit, the trial judge in this proceeding concluded that Diaz's signature was authored by Barnes.

The judge described these transfers from Barnes's company to DeYeso's account as a method of "wash[ing]" Barnes's funds. Also on June 23, 1999, an entity named Danube International (Danube) wired $50,000 to the account.[10]

DeYeso made the high bid of $425,000 at auction but failed to secure financing. On August 10, 1999, Citizens Bank took title to the Vineyard property in consideration of $425,000 and subject to a one-year right of redemption in favor of Barnes. DeYeso's financing subsequently came through and on October 20, 1999, Citizens Bank conveyed the property to her in consideration of $452,000.[11] A mortgage loan from Dukes County Savings Bank to DeYeso provided $300,000 of the purchase price. DeYeso argued that the remainder of the purchase price was provided by her own savings and by a $125,000 loan from her sister secured by a second mortgage on the New Hampshire property. Although a second mortgage was recorded on the New Hampshire property, the trial judge found no documents sup-

---

[10]The judge found that Danube was a means for Barnes to funnel funds from himself to DeYeso. Through her deposition testimony DeYeso claimed that Danube was a "d/b/a" that she formed for her own purposes, including the import of low-cost products from "Hungary or any other third-world country" that ran for a number of years and "wasn't terribly successful." Barnes testified that Danube was a corporation that he established together with a wealthy foreign friend named "Ramon Diaz" whom he met at antique or collectible car shows in Europe. According to Barnes, Diaz provided funds to Danube to permit Barnes to "explore some new possibilities either in the Far East or over in Eastern Europe." Danube appears to have been incorporated because Barnes testified that "for brief periods of time" he may have held one hundred per cent of its bearer shares making him the sole owner of the company. The judge made no findings as to who, if anyone, held Danube's bearer shares when they were not in Barnes's possession. Regardless of its corporate structure, DeYeso and Barnes agree that Diaz intended Danube to operate as "a pool of money" from which a number of people could draw without oversight. Cavadi questions the existence of Ramon Diaz and the judge found credible the testimony of Barnes's former business partner that Barnes and Danube are one and the same. In any event, Danube appears to have been flush with cash.

[11]In another proceeding, DeYeso submitted a memorandum of law stating that "during the period from 1997 through 1999, Barnes became indebted to DeYeso, in the amount of $452,000" and supported this assertion by attaching an "Agreement for Payment." The agreement states: "DeYeso, on behalf of Barnes's debts to his creditors, remunerated a sum of $452,000 . . . to Citizen's Bank in connection with the seizure of property located in Edgartown, Massachusetts." The judge found this agreement to be persuasive evidence that DeYeso purchased the Vineyard property on behalf of Barnes.

porting actual transfer of funds between the sisters and that the only evidence of the loan's existence was DeYeso's word, which he took "as worthless." Instead, the judge found that Barnes was the source of the funds by means of the transfers described *supra*.[12]

Two days after her purchase of the Vineyard property, Barnes gave a release deed to DeYeso in which he waived his right of redemption in consideration of one dollar.[13] DeYeso then conveyed the property to a trust in which she controls the principal and income and which, at her death, will be distributed to her children. The judge found that Barnes continued to live at and enjoy the Vineyard property and discounted testimony that he vacationed at the Vineyard property with DeYeso "for appearance sake for the kids." The judge found that the indicia of fraud surrounding these transactions were "extensive" and that Barnes intended for DeYeso to hold the property as his straw. As a result, the judge concluded that Barnes was the true owner of the Vineyard property that was held in trust for him by DeYeso.

*The New Hampshire property.* By means of a warranty deed dated April 28, 1997, Raymond L. Masse and Susan E. Masse conveyed to DeYeso property located at 12 Morning Star Drive, Stratham, New Hampshire. The New Hampshire property has been the primary residence of DeYeso and her children since its purchase.

A mortgage loan from the Piscataqua Savings Bank to DeYeso

---

[12]The judge was permitted to disbelieve DeYeso's evidence regarding the occurrence of the purported loan and instead to credit Cavadi's evidence that the funds came from Barnes. DeYeso asserts that the judge impermissibly treated disbelief as evidence of the opposite. This court has said that there may be circumstances in which "testimony, although not worthy of credence, might be of such character as to lead to the conclusion that if the transaction were honest such testimony would not have been presented, and thus might tend to support the affirmative burden resting on the plaintiffs." *Rioux* v. *Cronin*, 222 Mass. 131, 134 (1915). This is such a case.

The distinction between supporting the plaintiff's case and acting as affirmative evidence is finely drawn, but in these circumstances, the judge essentially determined that DeYeso's testimony was "so inherently improbable as to afford presumptive evidence of fraud." *Id.* at 135.

[13]DeYeso acknowledged that, had this right of redemption been exercised, the property would have been seized by Barnes's creditors. The right was therefore valueless to Barnes but may have been of value to DeYeso or to Barnes's creditors.

provided $200,000 of the $298,500 purchase price. The remaining $98,500 of the purchase price is the subject of significant dispute. DeYeso asserted that no portion of the funds came from Barnes. Instead, she reported that $11,000 come from her cash savings, $37,461 from repayment of a loan to SACA Management, and the remainder from her earnings as a broker and via Danube.

DeYeso presented no evidence of her cash savings other than deposition testimony from March, 1997, that she had "definitely over $100,000" in cash despite her 1995 bankruptcy and the dearth of any substantial evidence as to her employment or income. DeYeso also reported that in 1995 she had substantial cash ($35,000) either in a Hungarian safe deposit box, in "some U.S. bank," or in some other source she no longer recalls. This cash savings was alleged to be the source of the funds lent to SACA Management.

The judge, however, found that the vast majority of the $98,500 actually passed through Danube and originated with Barnes. The largest portion, $56,393, represents proceeds from the sale of a condominium previously owned by Barnes, foreclosed on, purchased by a straw owner on behalf of Barnes, and eventually sold to finance DeYeso's purchase of the New Hampshire property. Further, the judge found that the loan to SACA Management was actually a loan from Barnes (via Danube) which was then "repaid" to DeYeso as a means of funneling money between the couple. More than $94,000 of the $98,500 down payment therefore reached DeYeso by means of transfers from Barnes. The judge concluded that these transfers occurred with intent to defraud.

Barnes's intention to hide his involvement with the New Hampshire property was further evidenced by testimony from one of his business partners that, among other things, Barnes arranged that invoices for improvements to the New Hampshire property be in the name of the business partner because Barnes was "trying to keep his name off as many documents as possible as they relate to [DeYeso], so they don't tie together too much."

The judge concluded that Barnes held an interest in the New Hampshire property in the amount of $94,854 — the portion of the down payment proved by Cavadi to have originated with Barnes.

*The South Boston property.* John Humbert, the same business partner with whom Barnes owned the Vineyard property, testified that he and Barnes purchased a number of other properties together during the 1980's. One of those properties was a parking garage on K Street in South Boston that they bought in 1985 and owned in equal shares. On March 23, 1993, Cavadi secured an order enjoining Humbert from paying any sums to Barnes either directly or indirectly until Cavadi's judgment was satisfied. On October 26, 2001, in consideration of one dollar, Barnes transferred his one-half interest in the South Boston property to DeYeso as trustee of a realty trust the beneficiaries of which are the three Barnes children.

In responding to Cavadi's assertion of inadequate consideration, DeYeso argued that transfer was actually in consideration of approximately $90,000 in outstanding child support payments due to her from Barnes. This consideration does not appear on the deed, and Barnes and DeYeso did not report the transfer of the South Boston property to the Department of Revenue, which was calculating Barnes's outstanding child support. DeYeso's position is further undercut by her claim, in another proceeding, that the South Boston property was transferred to her in consideration of monies DeYeso expended on behalf of Barnes relating to Citizens Bank's 1999 seizure of the Vineyard property. See note 8, *supra.*

The South Boston property was sold in 2005 for $700,000 and the one-half interest belonging to DeYeso as trustee has been placed into an escrow account. Presumably, the parking lot generated revenue between 2001 and 2005, but no income or profits generated by the property have been distributed to DeYeso. The judge identified badges of fraud surrounding Barnes's transfer of the property, found Barnes was insolvent or nearly insolvent at the time of the transfer, and found inadequate consideration. Accordingly, the judge ruled that the transfer was fraudulent and that Barnes was the owner of the proceeds of the South Boston property.

*2. Standard of review.* Cavadi's complaint includes counts to reach and apply each of the three properties and a final count under UFTA, G. L. c. 109A, that relates to all three properties. The UFTA claim did not survive DeYeso's special motion to dismiss pursuant to G. L. c. 184, § 15, and Cavadi has not

appealed the issue. Cavadi's common-law claims then survived DeYeso's motion for summary judgment and this case comes before us on the trial judge's findings of fact and conclusions of law as well as on review of the equitable remedies issued.

The standard of review relating to a jury-waived proceeding is well established — "[t]he findings of fact of the judge are accepted unless they are clearly erroneous" and "[w]e review the judge's legal conclusions de novo." *T.W. Nickerson, Inc.* v. *Fleet Nat'l Bank*, 456 Mass. 562, 569 (2010). See *Twin Fires Inv., LLC* v. *Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 420 (2005) ("we are bound by a judge's findings of fact that are supported by the evidence, including all inferences that may reasonably be drawn from the evidence"). "We examine the judge's imposition of equitable remedies under an abuse of discretion standard." *Demoulas* v. *Demoulas*, 428 Mass. 555, 589 (1998).

3. *Analysis.* In considering this case, we first address the cause of action brought by Cavadi in relation to the analysis applied by the trial judge, distinguishing the nonstatutory action to reach and apply from related actions that were not before the court. We then analyze DeYeso's challenge to the continuing vitality of the nonstatutory action to reach and apply and the application of the elements of that action to the properties at issue.

The only counts of Cavadi's complaint that went to trial were the reach and apply claims that were brought under the common law rather than pursuant to statute. At trial, however, the judge applied analysis that focused on the existence of fraudulent intent that is not an element of a nonstatutory action to reach and apply. See *Foster* v. *Evans*, 384 Mass. 687, 689-691 (1981) (*Foster*). The record is thus somewhat confused and the focus of the decision below is on facts that are relevant to fraudulent conveyance analysis rather than those that are most salient in considering a nonstatutory action to reach and apply. Nevertheless, the judge's findings and conclusions are sufficient for all relevant purposes.

It is helpful first to clarify the nature of the cause of action that Cavadi has pleaded. Nonstatutory actions to reach and apply are equitable actions developed by the English Courts of Chancery and, as such, fall within the general equity jurisdiction of this court and the Superior Court (G. L. c. 214, § 1) rather than

being creatures of statute within our special equity jurisdiction (G. L. c. 214, § 3). See *id.*; *Blumenthal* v. *Blumenthal*, 303 Mass. 275, 278 (1939) (*Blumenthal*); J.R. Nolan & L.J. Sartorio, Equitable Remedies § 1.3 (3d ed. 2007). Cavadi's claims thus are distinguished from both statutory actions to reach and apply, G. L. c. 214, § 3 (6), and statutory actions to reach and apply fraudulently conveyed property, G. L. c. 214, § 3 (8). See *Foster, supra* at 691; *Blumenthal, supra* at 278 ("Suits in equity to set aside a fraudulent conveyance . . . are not cognizable as subjects of general equitable jurisdiction but are the creations of statutes conferring special equitable jurisdiction upon the courts"); J.R. Nolan & L.J. Sartorio, Equitable Remedies, *supra* at § 24.8, at 612.

Prior to the merger of law and equity, nonstatutory actions to reach and apply were known as "creditor's bills." *Foster, supra* at 691. Traditionally a creditor's bill could be brought (i) by a judgment creditor, (ii) who had attempted to obtain satisfaction at law, and (iii) who sued in equity for the purpose of reaching property that could not be taken on execution at law. *Id.*, quoting *Pettibone* v. *Toledo, Cincinnati & St. Louis R.R.*, 148 Mass. 411, 416-417 (1889) (*Pettibone*) (describing purposes of creditor's bill in English Courts of Chancery). These elements clearly reflect the historical purposes of the action and the reasons for its creation.

"The jurisdiction of equity to entertain suits in aid of creditors undoubtedly had its origin in the narrowness of the common-law remedies by writs of execution." 4 Pomeroy's Equity Jurisprudence § 1415, at 1065 (5th ed. 1941). See *Freedman's Sav. & Trust Co.* v. *Earle*, 110 U.S. 710, 712-715 (1884). The purpose of the creditor's bill was thus to make available to creditors the value of equitable assets of the debtor that were not recognized by courts of law with the classic examples being intangible assets and assets held in trust. See G. Glenn, Fraudulent Conveyances § 26 (1931); F.S. Wait, Fraudulent Conveyances and Creditors' Bills §§ 23-50(b) (3d ed. 1897) (describing classes of equitable assets subject to creditors' bills). Because trusts can be declared over real estate and tangible assets that are in the possession of a third party, a major focus of creditor's bills was providing creditors with equitable relief. See *Grupo Mexicano de Desarrollo, S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999); *Clapp* v. *Ingraham*, 126 Mass. 200, 203 (1879) ("as the rights of the

creditors [regarding equitable assets] could only be enforced in a court of chancery, they were remediless so long as no adequate equity jurisdiction existed in this Commonwealth").[14] Although creditors' bills could be used to reach certain fraudulently conveyed assets, see, e.g., *Pickard* v. *Clancy*, 225 Mass. 89, 91 (1916), they also provide relief in other circumstances and therefore are not coextensive with the field of remedies for fraudulent conveyances.

As regards express trusts, the case of *Shattuck* v. *Burrage*, 229 Mass. 448 (1918), displays the contrast most clearly. In that case, property of the debtor's mother was placed in trust with a general power of appointment vested in the debtor. *Id.* at 450. In his will, the debtor exercised the power of appointment so that the trust assets were transferred to a residuary trust without passing through his estate. *Id.* This court held that "[o]n no theory of hard fact [was] the property appointed the property of the [debtor]." *Id.* at 451. Nonetheless, "[e]quity assumed," in the words of Chief Justice Rugg, "as matter of good conscience and sound morals that a man in debt could not honestly have meant to give property to his friends or relatives to the exclusion of his creditors, when he could give it to anybody he chose." *Id.* The assets over which the debtor held and exercised a power of appointment could thus be reached under equitable processes, such as a creditor's bill, but not at law. *Id.* Because it is not clear that such a transaction might be avoided through application of UFTA, the equitable action remains broader than the available statutes. See G. L. c. 109A, § 2, 5, 6 (addressing transfers of assets, which are defined as being certain property of debtor).

---

[14]Considering the distinction between law and equity that originally inspired the nonstatutory action to reach and apply, it is important to note that following the American Revolution the courts of this Commonwealth were exclusively courts of law. See J.R. Nolan & L.J. Sartorio, Equitable Remedies § 1.3, at 3-4 (3d ed. 2007). During the course of the Nineteenth Century, the Legislature alleviated some of the resulting harshness by enacting a number of statutes granting equitable jurisdiction for special purposes which, in some instances, extended powers not available in traditional equity jurisdiction. *Id.* See *Blumenthal* v. *Blumenthal*, 303 Mass. 275, 278 (1939). The Legislature ultimately granted general equitable jurisdiction to this court in 1857 and broadened the base of that jurisdiction in 1877. See St. 1877, c. 178; St. 1857, c. 214; J.R. Nolan & L.J. Sartorio, Equitable Remedies, *supra* at § 1.3, at 5-6. The statutory grants of special equitable jurisdiction, however, generally remain in effect and are now codified at G. L. c. 214, § 3.

Similarly, a creditor's bill could reach assets contained in resulting trusts, which are implied by law and not necessarily available to a claimant in a fraudulent conveyance action. A resulting trust "typically occurs where 'a transfer of property is made to one person and the purchase price is paid by another; in such a case a trust results in favor of the person who furnished the consideration.' " *Maffei* v. *Roman Catholic Archbishop of Boston,* 449 Mass. 235, 253 (2007) (*Maffei*), quoting *Meskell* v. *Meskell,* 355 Mass. 148, 150 (1969). See Restatement (Third) of Trusts § 7 comment (c), at 89 (2003); 6 A.W. Scott, W.F. Fratcher, & M.L. Ascher, Trusts § 40.1 (5th ed. 2009). While a plaintiff in a fraudulent transfer action must establish the debtor's actual or implied fraudulent intent (see G. L. c. 109A, §§ 5, 6), a resulting trust merely requires proof of intent that the person holding title not also hold the beneficial interest. See *Maffei, supra.* Creditor's bills seeking property held in a resulting trust may, therefore, be brought in circumstances entirely distinct from those that might support a UFTA claim.

One type of constructive trust, implied by law as a result of mistake, violation of a fiduciary duty, or unjust enrichment, may be imposed, generally as between transferor and transferee, without proof of fraudulent intent. See *id.* at 246 ("A constructive trust is a flexible tool of equity designed to prevent unjust enrichment resulting from . . . a violation of a fiduciary duty or confidential relationship, mistake, or 'other circumstances' in which a recipient's acquisition of legal title to property amounts to unjust enrichment"). A constructive trust also may be imposed as a result of fraud on the transferor. *Id.* Due to the dissimilar intent requirements, such constructive trusts may also fall outside the purview of fraudulent conveyance law but within the scope of a creditor's bill. See G. L. c. 109A, §§ 5, 6.

A different kind of constructive trust may arise where property is conveyed in fraud of third-party creditors rather than in fraud of the transferor or transferee. 5 A.W. Scott & W.F. Fratcher, Trusts § 470, at 363-367 (4th ed. 1989). Cf. *Black* v. *Black,* 4 Pick. 234, 237-238 (1826) (noting existence of "constructive trusts which by the rules and principles of courts of chancery are considered to exist whenever a deed of conveyance . . . is made for the purpose of defrauding or delaying creditors" but

that this court had no jurisdiction because it was, in 1826, "not a court of general chancery jurisdiction, but a court of common law"). Being available only where property has been conveyed in fraud of creditors, the circumstances in which this type of constructive trust arises are necessarily circumstances in which UFTA also will apply. See G. L. c. 109A, §§ 5, 6. But see *Shattuck* v. *Burrage, supra.*

In light of the foregoing discussion it is clear that the nonstatutory action to reach and apply pleaded by Cavadi is not coextensive with an action under UFTA. See G. L. c. 109A; *Bernard* v. *Barney Myroleum Co.*, 147 Mass. 356, 359 (1888) (action to reach and apply fraudulently conveyed assets is creature of statute and "is not a creditor's bill"); *Drake* v. *Rice*, 130 Mass. 410, 412, 413 (1881). The judge's application of fraudulent transfer analysis in deciding Cavadi's reach and apply action was therefore unnecessary, except as to the South Boston property, which we will address later. As to the Vineyard and New Hampshire properties, the judge was required only to apply the elements of the traditional equitable creditor's bill. See *Foster, supra* at 691, quoting *Pettibone, supra* at 417 ("nonstatutory creditor's bills could be brought in courts of equity by creditors 'who have in vain attempted at law to obtain satisfaction of [their] judgments, and who sue in equity for the purpose of reaching property which could not be taken on execution at law' "). As a consequence, we need not address DeYeso's arguments that the judge failed to apply the proper elements of common-law fraudulent conveyance and that Cavadi failed to show the elements of common-law fraudulent conveyance. Indeed, if DeYeso were successful with this argument, we would still look to see if Cavadi met his proof as to the elements of a creditor's bill.

We turn to the question of the continuing vitality of the nonstatutory action to reach and apply and DeYeso's principal argument that the enactment of UFTA supersedes any claim to reach and apply property that has been fraudulently conveyed. In considering DeYeso's argument, we begin with the admonition that UFTA, "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of [G. L. c. 109A]." G. L. c. 109A, § 12. The interpretation sought by DeYeso, however, is in derogation of the common law, so we also look to the rule that "an existing common

law remedy is not to be taken away by statute unless by direct enactment or necessary implication." *Eyssi* v. *Lawrence,* 416 Mass. 194, 199-200 (1993), quoting *Ferriter* v. *Daniel O'Connell's Sons,* 381 Mass. 507, 521 (1980). See *Suffolk Constr. Co.* v. *Division of Capital Asset Mgt.,* 449 Mass. 444, 454 (2007), quoting *Riley* v. *Davison Constr. Co.,* 381 Mass. 432, 438 (1980) ("We consider the statute in light of the common law . . . and we do not construe a statute 'as effecting a material change in or a repeal of the common law unless the intent to do so is clearly expressed' "); 2B N.J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 50:5 (7th ed. 2008). Chapter 109A contains no express language addressing nonstatutory actions to reach and apply, so our inquiry turns to the possibility of implied abrogation. See *Eyssi* v. *Lawrence, supra* at 199-200.

DeYeso argues that intent to abrogate all common-law causes of action as to fraudulent conveyances is implicit in the broad scope of UFTA and in the interest of uniformity that underlies UFTA. See *Salisbury* v. *Salisbury Water Supply Co.,* 279 Mass. 204, 206 (1932) (where "legislation has been enacted which seems to have intended to cover the whole subject to which it relates, it . . . supersedes the common law"). Briefly put, the argument is that UFTA must "cover the whole subject to which it relates" because uniformity can be achieved only if UFTA is the sole means of achieving relief for creditors.[15]

We are not persuaded that the Massachusetts enactment of

---

[15]DeYeso also argues that enactment of a statute by the post-Revolution Commonwealth abrogates prior English statutes and she traces the origins of fraudulent conveyance law back from the Uniform Fraudulent Transfer Act (UFTA), through the Uniform Fraudulent Conveyance Act (UFCA), to the Statute of Elizabeth, which was adopted by custom and usage into the common law of Massachusetts. See *Pearce* v. *Atwood,* 13 Mass. 324, 354 (1816) (preexisting English statutes are repealed when Legislature enacts similar statute). DeYeso's chronology appears to be correct. See Kennedy, The Uniform Fraudulent Transfer Act, 18 UCC L.J. 195, 196, 200 (1986) ("The [UFCA] was a codification of the 'better' decisions applying the Statute of 13 Elizabeth of 1571" and "[t]he basic structure and approach of [UFCA] are preserved in [UFTA]"). See also *Drake* v. *Rice,* 130 Mass. 410, 412-413 (1881) (noting 13 Eliz., c. 5, applies in Massachusetts and was "but declaratory of the law as it was before"). However, Cavadi's claim is not a common-law claim of fraudulent conveyance that would be, in part, a creature of English statute. Rather, Cavadi's claim is a creditor's bill that is a creation of the Courts of Chancery and does not originate in an English statute. DeYeso's argument is thus beside the point.

UFTA was intended to be such an all-encompassing statute because it expressly contemplates supplementation by the common law. *Id.* See G. L. c. 109A, § 11 ("Unless otherwise required by the provisions of this chapter, the principles of law and equity, including . . . estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, shall supplement its provisions"). We find support in the analysis of the United States Court of Appeals for the First Circuit of similar language in Rhode Island's enactment of UFTA. *In re Valente*, 360 F.3d 256, 261 (1st Cir. 2004). In that case the court held that, "[a]t the very least, this clause demonstrates a desire by the drafters to preserve the common law as a supplement to the UFTA unless precluded by the terms of the Act." *Id.* Moreover, the drafters' comments to UFTA underscore the point, stating that, "this Act is not an exclusive law on the subject of voidable transfers and obligations." Comment 2 to UFTA § 1, 7A (Part II) U.L.A. 16 (Master ed. 2006). The reporter for the committee that drafted UFTA similarly states that "neither the original . . . nor the revised Act . . . is a complete or exclusive law covering fraudulent transfers and obligations." Kennedy, The Uniform Fraudulent Transfer Act, 18 UCC L.J. 195, 200 (1986).

We therefore conclude that, far from implicitly suppressing common-law causes of action, UFTA is designed to establish a uniform statutory baseline for fraudulent transfer actions which is supplemented by the common law unless there is an inherent conflict. Accordingly, because the nonstatutory cause of action sweeps more broadly than UFTA, its abrogation is not "required by the provisions of [c. 109A]." See G. L. c. 109A, § 11. Cf. *In re Valente, supra* at 261-262, and cases cited ("reject[ing] the proposition that the adoption of the UFTA by a state preempts all common law remedies," including equitable remedies).

Although the nonstatutory action to reach and apply is clearly broader than UFTA, there are circumstances in which both UFTA and the nonstatutory action to reach and apply will be applicable. As previously discussed this will involve cases where a constructive trust is implied for the benefit of creditors in order to set aside a fraudulent conveyance. UFTA necessarily takes precedence in such circumstances. See G. L. c. 109A, § 11. An analysis of the circumstances in a particular case is

necessary to determine whether the basis of the nonstatutory action to reach and apply lies outside the reach of UFTA, or whether it overlaps with UFTA. If it is the former, the nonstatutory action is viable; if it is the latter, the nonstatutory action is preempted by UFTA.

Having held that the nonstatutory action to reach and apply is abrogated by UFTA only where the implication is necessary, we turn to the three elements of the action and their application here. See *Foster, supra*; *Pettibone, supra* (requiring that creditor have secured judgment, unsuccessfully sought to execute on judgment, and "property which could not be taken on execution at law"). There is no question that Cavadi has a judgment against Barnes. Similarly, it is undisputed that Cavadi has been unable to execute on the judgment. Resolution of this case therefore hinges on the final element, that the assets sought are "property [of the debtor] which could not be taken on execution at law." *Id.* See *First Nat'l Bank* v. *Nichols*, 294 Mass. 173, 182 (1936) (alternatively referring to "equitable assets of the debtor" that may be applied "to the payment of his debts"). Because this description is phrased solely in the negative — all assets except those that may be reached at law — the category of property interests that may be reached is sweeping. See *Foster, supra* at 691; *Pettibone, supra* at 417.

*The Vineyard property.* Cavadi argues that the Vineyard property is Barnes's equitable asset though title lies in DeYeso's name. In considering whether Barnes is the true owner of the Vineyard property we find guidance in the doctrine of resulting trusts:

> "[W]ithin the well recognized principle of equity jurisprudence . . . where one buys and pays for real estate, but the conveyance of the title is to another, a trust results in favor of the one who pays the consideration."

*Howe* v. *Howe*, 199 Mass. 598, 600 (1908). See *In re Valente, supra* at 263-264 (applying resulting trust analysis to supplement UFTA). A presumption of a resulting trust thus arises where a purchaser takes title in the name of another. The presumption may be rebutted, however, because "a resulting trust pivots on the key element of intention [and] [t]he party who furnishes

consideration must not intend to do so as 'a gift or advancement' to the one who takes legal title to the property." *Maffei, supra* at 253-254. See Restatement (Third) of Trusts § 7 comment (a), at 86 (2003); Restatement (Second) of Trusts § 441, at 396-397 (1959). Further, where a purchaser takes title in the name of a family member, the likelihood that the purchaser intended to bestow a gift may rebut the presumption of a resulting trust. See *Dwyer* v. *Dwyer*, 275 Mass. 490, 494 (1931); Restatement (Third) of Trusts, *supra* at § 9(2), at 124; Restatement (Second) of Trusts, *supra* at § 443, at 403. Cavadi's claim was viable. It required no proof of a fraudulent conveyance and therefore was discrete from, and not preempted by, UFTA.

The judge found that DeYeso held title to the Vineyard property as Barnes's straw. The presumption of a resulting trust was thus open, but it was not rebutted.[16] Although there was considerable evidence that Barnes's intent was fraudulent, it was relevant only to rebut a claim by DeYeso, if made, that Barnes did not intend to retain the beneficial interest in the property. Considering the circumstances under which DeYeso took title to the Vineyard property and the trial judge's findings regarding the couple's course of dealings, we cannot say that the judge's conclusion that the entire Vineyard property was held in trust was an abuse of discretion.

*The New Hampshire property.* Cavadi also asserted that the New Hampshire property was held in DeYeso's name but was actually Barnes's asset. The judge found that "Barnes funneled $94,854 to DeYeso" for use in purchasing the property and determined that there were "badges of fraud" surrounding these transactions. Based on Barnes's providing the vast majority of the down payment on the New Hampshire property and the absence of any finding of donative intent, the trial judge could permissibly have imposed a resulting trust on the New Hampshire property.[17] See *Maffei, supra*; Restatement (Third) of Trusts, *supra* at § 7 comment (a), at 86. Rather than determine that the

---

[16]DeYeso did not pursue the argument that her romantic relationship with Barnes required that a donative intent be presumed. Instead, DeYeso focused on her purported estrangement or distance from Barnes as well as the existence of outstanding child support, arguments that emphasize the adversary nature of her relationship with Barnes. She claimed she was the source of the purchase monies and the mortgage payments, not Barnes.

[17]Because this is an action in personam, it was properly brought in the

entire property was held by DeYeso as Barnes's straw and imposing a trust accordingly, the judge instead declared that Barnes holds an interest in the property equal to the portion of the purchase price he provided — $94,854. Cavadi's nonstatutory claim required no proof of a fraudulent conveyance and thus was not preempted by UFTA.

DeYeso argues that no trust may be imposed over either the Vineyard property or the New Hampshire property because the funds transferred by Barnes could have been provided in respect of his child support obligations and because the judge incorrectly valued Barnes's interest in the two properties. As regards the child support argument, DeYeso introduced evidence showing that Barnes was substantially in arrears on his child support obligations. The judge found, however, that Barnes and DeYeso engaged in any number of transactions designed to move assets from him to her without leaving a paper trail. The judge also found that Barnes cannot tell how much money he provided to DeYeso between 1994 and 2001, was substantially in arrears on his child support obligations in 2001, made no payments in respect of his child support arrearage between 2001 and 2007, and never advised the Department of Revenue of certain transactions now alleged to have constituted the payment of child support. Assuming without deciding that it is permissible for Barnes to pay child support in this manner in preference of other creditors, the judge was not required to believe Barnes's testimony or agree with DeYeso's characterization of the transfers. Where Barnes arranged to provide funds to DeYeso in an undocumented and intentionally secretive manner while accumulating a large child support arrearage, it was not clearly erroneous for the judge to hold Barnes and DeYeso to that arrangement by refusing to treat the payments as child support.

Superior Court despite the fact that the New Hampshire property is located outside the Commonwealth. See *Carver* v. *Peck*, 131 Mass. 291, 292 (1881) ("As the process of a court of chancery operates in personam, it is within the power of such a court, having jurisdiction of the person of the defendant, to compel or restrain a conveyance of his interest in personal property, or even in real estate, although the property or estate is itself outside the territory to which the jurisdiction of the court is limited"). Further, the parties have raised no question regarding conflict of laws; in any event, the law of New Hampshire does not appear to differ substantively from the principles we apply herein. See, e.g., *Chamberlin* v. *Chamberlin*, 116 N.H. 368, 370 (1976), citing Restatement (Second) of Trusts § 404 (1959).

Similarly, we cannot conclude that the judge's conclusions as to the value of Barnes's interest in either property were clearly erroneous or that the equitable remedies imposed were an abuse of discretion. Regarding the Vineyard property, the judge found that Cavadi had demonstrated that Barnes was the source of approximately eighty per cent of what amounted to a down payment made on the property. The judge made no express finding as to the sources of the remaining twenty per cent of the down payment and the continuing mortgage payments. The judge did find, however, that the property was used by both DeYeso and Barnes as a vacation property and that the indicia of fraud surrounding Barnes's involvement with the property were extensive. The judge also found that Barnes intended for DeYeso to hold the property as his straw and that the evidence only barely supported the proposition that DeYeso was independently capable of making mortgage payments on her primary residence, the New Hampshire property. In light of the facts found, we cannot conclude that it was error for the judge to draw the inferences necessary to conclude that Barnes is the sole equitable owner of the entire Vineyard property — namely, that he provided the unaccounted-for twenty per cent of the down payment as well as the continuing mortgage payments with the intent to retain a beneficial interest in the property.

The judge adopted a different line of reasoning regarding valuation of Barnes's interest in the New Hampshire property. The judge found that Barnes had provided nearly ninety-five per cent of the cash payment made on the New Hampshire property. He did not rule, however, that Barnes was the sole beneficial owner of the property. The reasoning supporting this determination is not clearly set forth in the decision below, but the judge did determine that proof that Barnes made continuing payments toward the mortgage on the New Hampshire property was lacking, and although DeYeso presented no credible evidence as to her income or even her capacity to earn income, it is not inconceivable that she could have made the mortgage payments on the New Hampshire property with independently acquired funds. It was not clearly erroneous for the trial judge to draw a different inference regarding mortgage payments on the New Hampshire property than he drew respecting the Vineyard property. It therefore was not an abuse of discretion to declare

that Barnes's interest in the New Hampshire property is limited to the $94,854 that he contributed toward its purchase.[18]

*The South Boston property.* Finally, we turn to the South Boston property. Unlike the Vineyard and New Hampshire properties, Barnes owned this real estate in his own name and his transfer of it to DeYeso was a matter of public record. Because the transaction was directly from Barnes to DeYeso, it is not possible for Cavadi to have shown the existence of a resulting trust. See Restatement (Third) of Trusts, *supra* at § 7 comment (c), at 89-90; Restatement (Second) of Trusts, *supra* at § 405, at 327 ("Where the owner of property transfers it without declaring any trust, the transferee does not hold the property upon a resulting trust although the transfer is gratuitous"). The obvious alternative is a constructive trust which "is a flexible tool of equity designed to prevent unjust enrichment resulting from fraud, a violation of a fiduciary duty or confidential relationship, mistake, or 'other circumstances' in which a recipient's acquisition of legal title to property amounts to unjust enrichment." *Maffei, supra* at 246.

In these circumstances there is no assertion that the transfer of the South Boston property was the result of fraud on Barnes, of mistake, or of the violation of a fiduciary duty or confidential relationship. See *id.* Instead, Cavadi has alleged only that the property was transferred in consideration of one dollar and that Barnes accordingly retains an equitable interest. The theory underlying any constructive trust that might be imposed is therefore one based on fraud by Barnes on Cavadi. See 5 A.W. Scott & W.F. Fratcher, Trusts § 470, at 363-367 (4th ed. 1989) (constructive trusts imposed as result of wrongs to third parties). An action to recover such an equitable interest is necessarily within the scope of UFTA and is thus the type of action that is

---

[18]DeYeso argues that if partial or proportional interests in the properties are to be awarded, her share should be calculated with the purchase price, less Barnes's proven contributions, as the numerator and the total purchase price as the denominator. By treating the financed portion of the sale price as funds contributed at purchase by DeYeso, this methodology would grant her a sixty-eight per cent interest in the New Hampshire property and a seventy-three per cent interest in the Vineyard property. The actual value of the couple's collective interest in the properties, however, is the equity in the property rather than the purchase or sale price. Where Barnes was found to have provided ninety-five per cent and seventy-nine per cent of the down payments the results produced by DeYeso's methodology are illogical.

preempted by the statute. See G. L. c. 109A, § 11. Cf. *Eyssi* v. *Lawrence*, 416 Mass. 194, 199-200 (1993). We can discern no other grounds on which Cavadi's claim might be supported. We therefore conclude that it was error for the trial judge to set aside the conveyance of the South Boston property.[19]

For the foregoing reasons we affirm the judgment as to Count I (the Vineyard property) and Count II (the New Hampshire property) of the complaint, but we reverse the judgment with respect to Count III (the South Boston property) and remand to the Superior Court for entry of judgment for DeYeso on Count III.

*So ordered.*

---

[19]Cavadi's UFTA claim would likely have been good as to the South Boston property and was brought within the four-year statute of limitations contained in G. L. c. 109A, § 10. The issue is not before this court, however, because Cavadi's UFTA count (relating to all three properties), was dismissed as a result of DeYeso's special motion to dismiss pursuant to G. L. c. 184, § 15, and Cavadi has not appealed from that ruling.