# United States Court of Appeals
## For the First Circuit

No. 19-2090

JANET H. FOISIE,

Plaintiff, Appellant,

v.

WORCESTER POLYTECHNIC INSTITUTE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Lynch, Selya, and Barron,
Circuit Judges.

Campbell D. Barrett, with whom Adam S. Mocciolo and Pullman
& Comley, LLC were on brief, for appellant.
Jennifer L. Chunias, with whom Roberto M. Braceras and Goodwin
Procter LLP were on brief, for appellee.

July 24, 2020

**SELYA**, **Circuit Judge**.  Over two centuries ago, Sir Walter Scott famously wrote about "what a tangled web we weave . . . when first we practise to deceive."  W. Scott, Marmion, canto VI, st. 17 (1808).  The factual scenario that undergirds this appeal — a scenario in which a husband, embroiled in matrimonial proceedings, allegedly concealed millions of dollars in assets in order to shortchange his wife in the divorce settlement — is a poster child for Scott's discerned wisdom.

The litigation out of which the appeal arises takes the form of a suit by the allegedly defrauded ex-wife, plaintiff-appellant Janet H. Foisie, against an eleemosynary institution, defendant-appellee Worcester Polytechnic Institute (WPI), which was a beneficiary of the ex-husband's largesse.  The suit seeks to recoup assets purportedly gifted for less than adequate consideration by the ex-husband, now deceased, to WPI.  The district court dismissed the plaintiff's complaint for what the court deemed an absence of statutory standing.  See Foisie v. Worcester Polytechnic Inst., 408 F. Supp. 3d 7, 17 (D. Mass. 2019).  After careful consideration, we vacate the judgment and remand for further proceedings.

## I. BACKGROUND

Because this appeal flows from the district court's order granting a motion to dismiss, we draw the relevant facts from the complaint, accepting all well-pleaded factual allegations

- 2 -

as true.  See SEC v. Tambone, 597 F.3d 436, 438, 441 (1st Cir. 2010) (en banc).

In September of 2010, Janet and Robert Foisie decided to part ways after approximately fifty years of marriage.  To start unraveling the marital knot, the couple engaged a private mediator in Connecticut.  The couple agreed to make complete and accurate disclosures of their assets.  On two occasions during mediation, Robert listed his assets and represented that he had no offshore accounts or other undisclosed assets.

The mediation proved fruitful:  Janet and Robert eventually agreed to a mutually acceptable split of assets and entered into a divorce settlement agreement (the Agreement).  Under the terms of the Agreement, the couple assented to a division of assets that left each with roughly $20,000,000 in securities and some real estate.  Robert also retained ownership of several corporations.  The Agreement required the parties to certify that each of them had "fully disclosed all of their assets."

In January of 2011, Janet initiated a marital dissolution action in a Connecticut state court.  Later that year, Janet and Robert jointly submitted the Agreement to the state court and moved for a stipulated judgment of dissolution (pursuant to the terms of the Agreement).  Shortly thereafter, the court entered the stipulated judgment.

In connection with the dissolution proceedings, Janet and Robert exchanged sworn financial statements purporting to disclose all of their respective assets. Robert also testified before the state court, affirming the truthfulness of his earlier disclosures and vouchsafing that he did not intend to collect on a $700,000 promissory note executed by the couple's son — an asset that Robert had previously disclosed. In accepting the terms of the Agreement and consenting to the stipulated judgment, Janet relied on Robert's representations about his assets.

Looking back, Janet now alleges that Robert deliberately deceived her about the scope of his assets throughout the negotiations leading to the divorce. Most prominently, she says that Robert failed to disclose the existence of a Swiss trust (the Vaduz Trust), valued at approximately $4,500,000 at the time of the divorce. This allegation is not plucked out of thin air: in November of 2016, Robert acknowledged (in a discovery response related to Janet's effort to reopen the divorce case) that he had failed to reveal the existence of the Vaduz Trust during the divorce proceedings.

In addition, Robert is alleged to have concealed the existence of twelve promissory notes, collectively valued at more than $10,000,000. All of these notes were executed either by the couple's son or by corporations owned at least partially by him, and all were payable to Robert. None of these notes corresponds

- 4 -

to the $700,000 promissory note that Robert made known during the divorce proceedings. In December of 2015, Robert accepted payment in the amount of $3,000,000 from his son against the promissory notes. He did not disclose this payment to Janet.

This flim-flam set the stage for the allegedly fraudulent transfers that lie at the heart of this litigation. After the divorce, Robert transferred the Vaduz Trust and the $3,000,000 he had surreptitiously collected from his son to WPI (his alma mater) as charitable gifts. In discovery connected with Janet's effort to reopen the divorce case, Robert appears to have acknowledged transferring the Vaduz Trust to WPI in March of 2016, ostensibly in partial satisfaction of an oral pledge that he made in 2009 to donate between $40,000,000 and $60,000,000 to the school. Janet further alleges that, in December of 2016, "Robert transferred yet more money to WPI and/or to the government of Antigua and Barbuda" to facilitate "unlimited" scholarships for prospective students from that country. In all, Janet says, Robert gave at least $39,000,000 to WPI following the divorce.

Robert died in June of 2018. Janet alleges, though, that through his fraudulent concealment of assets, Robert hoodwinked her into entering a disadvantageous divorce settlement based on a woefully inaccurate picture of his assets; that from and after the time of the divorce, she has had a claim on all of the assets Robert concealed during the divorce

- 5 -

proceedings (inasmuch as those assets were part of the marital estate); that Robert's estate is liable to her for, among other things, fraud and breach of contract; that Robert's various transfers to WPI were made for either no consideration or for less than equivalent value to thwart her legitimate claims; and that those transfers left Robert insolvent.

Robert's deceit sparked a rash of litigation.[1] To begin, Janet moved in April of 2015 — before Robert's transfers of the Vaduz Trust and funds collected on the promissory notes — to reopen the financial aspects of the divorce case. When discovery revealed that Robert had failed to disclose the Vaduz Trust and

---

[1] Although the complaint does not provide chapter and verse concerning the earlier litigation, it provides a docket number for the plaintiff's divorce case, references to discovery related to her motion to reopen that case, and allusions both to her claims regarding the assets that Robert concealed and to Robert's putative liability for the causes of action stated in her civil suit. In addition, the parties attached copies of the dockets associated with the plaintiff's state court proceedings to their briefing below. Although a court reviewing the grant of a motion to dismiss for failure to state a claim ordinarily may not stray beyond the facts averred in the complaint and its attachments, this rule admits of certain narrow exceptions for, among other things, official public records. See Freeman v. Town of Hudson, 714 F.3d 29, 35-36 (1st Cir. 2013). Judicial decisions and records from related state court proceedings fall within the public records exception. See San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, 687 F.3d 465, 471 & n.2 (1st Cir. 2012) (en banc); Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000). Consequently, we incorporate pertinent dates and details from the state court proceedings, including the Connecticut Supreme Court's recent decision permitting the plaintiff to substitute the executors of Robert's estate as defendants in one such case. See Foisie v. Foisie, __ A.3d __ (Conn. 2020) [No. SC 20384].

had subsequently transferred it to WPI, she brought a parallel civil action in a Connecticut state court in January of 2017 (after some but not necessarily all of Robert's transfers to WPI) against Robert and WPI for, among other things, fraud, fraudulent transfer, and breach of contract.

After WPI moved to dismiss the fraudulent transfer action for want of in personam jurisdiction, Janet withdrew her claims against WPI without prejudice and sued WPI in the United States District Court for the District of Massachusetts. Seeking to avoid Robert's allegedly fraudulent transfers to WPI and to recoup the assets allegedly concealed from her during the divorce proceedings, Janet asserted claims of actual and constructive fraudulent transfers under both the common law and Connecticut's version of the Uniform Fraudulent Transfer Act (UFTA), see Conn. Gen. Stat. §§ 52-552e to -552f. Following some procedural skirmishing that resulted, among other things, in the filing of an amended complaint,[2] WPI moved to dismiss. It contended (as relevant here) that Massachusetts law governed Janet's claims; that she did not qualify as a "creditor" capable of prosecuting UFTA claims; and that her common law claims were preempted by the Massachusetts version of the UFTA. Janet opposed the motion but, after briefing and oral argument, the district court dismissed the

---

[2] For ease in reference, we refer throughout to the first amended complaint as "the complaint."

- 7 -

complaint.  See Foisie, 408 F. Supp. 3d at 17.  This timely appeal ensued.

## II. ANALYSIS

The plaintiff attacks the district court's dismissal of her complaint primarily on two fronts.  First, she objects to the court's threshold determination that Massachusetts law governs her claims.  Second, she assigns error to the court's determination that she does not qualify as a "creditor" for purposes of the UFTA.  WPI defends the district court's rescript on both of these points.  In addition, it asserts an alternative basis for dismissal:  that the plaintiff failed to plead her claims with sufficient particularity.  After an examination of Article III standing and ripeness, we grapple with these issues sequentially.

### A.  Constitutional Standing & Ripeness.

During oral argument in this court, it was suggested for the first time that the existence of a Connecticut divorce judgment, as yet unmodified, might undermine the plaintiff's Article III standing and render her claims unripe.  Because this suggestion implicates our subject matter jurisdiction, ordinary waiver principles do not apply.  See Pollard v. Law Office of Mandy L. Spaulding, 766 F.3d 98, 101 (1st Cir. 2014).  We must, therefore, confront this suggestion head-on.

The "'irreducible constitutional minimum' of standing" comprises three elements:  a plaintiff "must have (1) suffered

an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). To establish an injury in fact, a plaintiff must demonstrate that "she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 1548 (quoting Lujan, 504 U.S. at 560). And to demonstrate that a case is ripe within the meaning of Article III, the facts alleged must "'show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of' the judicial relief sought." Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (quoting Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 326 (1st Cir. 2016)). The constitutional standing and ripeness inquiries are interrelated and often duplicative. See id. at 499-500. Importantly, however, both inquiries stand separate and apart from the plaintiff's qualifications as a creditor capable of pursuing claims under the UFTA. See Enter. Fin. Grp. v. Podhorn, 930 F.3d 946, 950 (8th Cir. 2019).

Even though the Article III concerns raised at oral argument centered on the plaintiff's effort to reopen the divorce

judgment, her fraudulent conveyance claims are not premised exclusively on that effort. She also alleges that Robert's transfers were made to hinder her ability to hold him accountable under a number of civil causes of action. But whether we view the plaintiff's fraudulent conveyance claims through the prism of her underlying civil suit or her underlying effort to reopen the divorce case, we conclude that the plaintiff easily satisfies the three elements of Article III standing.

To start, she has plausibly alleged a concrete economic injury — that Robert fraudulently concealed millions of dollars that were part and parcel of the marital estate, triggering his liability to her for various tort and contract claims; that he gratuitously transferred the concealed assets to WPI to frustrate her claims; and that he subsequently conveyed millions more to WPI without adequate consideration and in a manner that rendered him insolvent. See Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 638 (1st Cir. 2013) (describing financial harm as quintessential injury in fact). Furthermore, the plaintiff's claimed injury is fairly traceable to WPI's role in the transfers because WPI's alleged receipt of the transferred assets deprived the plaintiff of those assets and rendered Robert insolvent. See Enter. Fin., 930 F.3d at 950. The UFTA, like the common law, provides a broad spectrum of remedies that would, if the plaintiff's fraudulent conveyance claims prove meritorious,

redress her alleged injury by allowing her, for instance, to avoid the transfers or secure an injunction prohibiting WPI from disposing of the transferred assets. See Conn. Gen. Stat. § 52-552h; Mass. Gen. Laws ch. 109A, § 8; Robinson v. Coughlin, 830 A.2d 1114, 1117-19 (Conn. 2003); Cavadi v. DeYeso, 941 N.E.2d 23, 32-34 (Mass. 2011).

To put the frosting on the cake, the plaintiff's fraudulent conveyance claims — at least to the extent that those claims are predicated on her underlying civil suit — appear ripe for adjudication. The parties' legal interests are unquestionably adverse, and they are at loggerheads with respect to every facet of the plaintiff's fraudulent conveyance claims. What is more, the controversy between the parties is "'of sufficient immediacy and reality to warrant the issuance of' the judicial relief sought." Reddy, 845 F.3d at 500 (quoting Labor Relations Div., 844 F.3d at 326). The plaintiff's underlying civil claims are actively being litigated and, if she successfully prosecutes her fraudulent conveyance claims, various remedies could be crafted to redress her injury regardless of whether her civil claims have been reduced to judgment by that time. See, e.g., Conn. Gen. Stat. § 52-552h; Mass. Gen. Laws ch. 109A, § 8.

Similarly, the plaintiff's fraudulent conveyance claims appear ripe to the extent that they are based on her

- 11 -

motion to reopen the divorce case. Although an unresolved effort to exhume a divorce judgment might conceivably spawn ripeness concerns in some circumstances, the circumstances here do not engender such concerns. The plaintiff filed her motion to reopen the divorce case well before she lodged her fraudulent conveyance claims in this action, and her motion to reopen remains pending. Indeed, the Connecticut Supreme Court recently breathed new life into it, reversing the superior court's denial of the plaintiff's motion to substitute the executors of Robert's estate as defendants in the aftermath of Robert's death. See Foisie v. Foisie, __ A.3d __, __ (Conn. 2020) [No. SC 20384, slip op. at 13]. And in any event, in considering how the existence of a settled divorce judgment alters the ripeness calculus, we think it relevant that, at bottom, the plaintiff's motion to reopen the divorce case is premised on plausible allegations that the judgment was secured through fraud. See id. at __ [slip op. at 2].

Finally, the fact that the plaintiff must reopen the divorce judgment before she can secure an adjustment of the marital estate is a barrier functionally indistinguishable from the barriers facing the plaintiff in her civil suit against Robert. In each instance, she must overcome certain obstacles in order to establish Robert's liability before prevailing. If the absence of a final judgment in the underlying civil suit

- 12 -

does not automatically make this case a green banana — and we do not think that it does — we fail to see how the still-unopened divorce judgment could have such an effect.  When all is said and done, we conclude that, under these circumstances, the plaintiff's motion to reopen the divorce case is of sufficient concreteness and immediacy to warrant a finding that her fraudulent conveyance claims (to the extent that they are premised on that motion) are ripe within the purview of Article III.

### B.  Choice of Law.

As a threshold matter, the record makes manifest that the requirements for diversity jurisdiction, see 28 U.S.C. § 1332(a), are satisfied.  Janet is a citizen of Florida, WPI is a Massachusetts corporation and maintains its principal place of business there, and the amount in controversy comfortably exceeds $75,000.  Moreover, it is apodictic that a federal court sitting in diversity jurisdiction must apply state substantive law.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1, 4 (1st Cir. 1994).

In this case, the parties disagree about whether Connecticut or Massachusetts law supplies the substantive rules of decision.  The plaintiff insists that Connecticut law governs, emphasizing that Robert's deception took place in Connecticut, the divorce judgment was entered by a Connecticut court, and her

underlying claims against Robert arise under Connecticut law.  WPI rejoins that Massachusetts law applies, noting that both WPI itself and at least a substantial portion of the disputed funds are located in the Commonwealth.  The district court chose to apply Massachusetts law.  See Foisie, 408 F. Supp. 3d at 14.  We review this determination de novo.  See Levin v. Dalva Bros., 459 F.3d 68, 73 (1st Cir. 2006).

Of course, a choice-of-law determination is obligatory only if a material conflict exists between the laws of the interested states.  See id.  If "nothing turns on more precise refinement," there is no need to make a formal choice of law. Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1092 (1st Cir. 1989).  Without further ado, we turn to this inquiry.

As pertinent here, Connecticut and Massachusetts have adopted facially identical iterations of the UFTA.[3]  Each version of the statute provides that a debtor's transfer is actually fraudulent as to a creditor with a preexisting claim if the debtor makes the transfer "[w]ith actual intent to hinder, delay or

---

[3] When relevant, we cite Massachusetts precedent interpreting provisions of the UFTA's predecessor statute, the Uniform Fraudulent Conveyance Act (UFCA), which remained in effect in the Commonwealth until the UFTA's enactment in 1996.  See Innis v. Robertson, 854 N.E.2d 105, 110 n.5 (Mass. App. Ct. 2006).  Because the UFTA preserves the UFCA's basic approach and structure, see Cavadi, 941 N.E.2d at 35 n.15, we deem this precedent authoritative for how Massachusetts courts would (and do) interpret the UFTA.

- 14 -

defraud any creditor."[4]  Conn. Gen. Stat. § 52-552e(a)(1); see

Mass. Gen. Laws ch. 109A, § 5(a)(1).  So, too, both versions

provide that a debtor's transfer is constructively fraudulent as

to a creditor with a preexisting claim if the debtor makes the

transfer "without receiving a reasonably equivalent value in

exchange for the transfer . . . and the debtor was insolvent at

that time or the debtor became insolvent as a result of the

transfer."  Conn. Gen. Stat. § 52-552f(a); Mass. Gen. Laws ch.

109A, § 6(a).  The two versions also contain materially identical

delineations of both the remedies available to creditors and the

limitations on those remedies.  See Conn. Gen. Stat. §§ 52-552h

to -552i; Mass. Gen. Laws ch. 109A, §§ 8-9.

_____

        [4] To be sure, the Massachusetts version of the UFTA — unlike
its Connecticut counterpart, see Conn. Gen. Stat. § 52-552e(a) —
permits a claim for actual fraudulent transfer even when the
creditor's claim arises after the transfer.  See Mass. Gen. Laws
ch. 109A, § 5(a).  But the two states appear to have adopted a
similarly broad view of when a putative creditor's claim arises.
See Canty v. Otto, 41 A.3d 280, 290-91 (Conn. 2012) (observing
that UFTA plaintiff's claim arose "on the date of the injury"
in underlying tort action (quoting Davenport v. Quinn, 730 A.2d
1184, 1198 (Conn. App. Ct. 1999))); Jorden v. Ball, 258 N.E.2d
736, 738 (Mass. 1970) (deeming UFCA plaintiff a "creditor" based
on "unperfected" and "possible" claims that "merely await[ed]
some further step on her part which . . . was likely to occur");
Innis, 854 N.E.2d at 107, 110 (noting that unresolved fraud
claim was sufficient to make plaintiff a creditor under UFCA).
Because the plaintiff had viable claims against Robert before
the first transfer described in the complaint under either
state's understanding of when a claim arises — through, say, the
tort claims that developed at the time of Robert's deception or
the plaintiff's motion to reopen the divorce case — this
distinction between the Massachusetts and Connecticut versions
of the UFTA is inconsequential here.

Diving deeper, it appears that Connecticut applies a distinctive gloss on the elements of a claim for actual fraudulent conveyance. Both Massachusetts and Connecticut permit a transferee to assert as a defense to the avoidance of actually fraudulent transfers that it received the transfer "in good faith and for a reasonably equivalent value." Conn. Gen. Stat. § 52-552i(a); see Mass. Gen. Laws ch. 109A, § 9(a). Connecticut courts, though, have indicated that (at least in some circumstances) a transfer is not actually fraudulent in the first instance unless the plaintiff can show "that the conveyance was made with a fraudulent intent in which the grantee participated." McKay v. Longman, 211 A.3d 20, 38 (Conn. 2019) (quoting Certain Underwriters at Lloyd's, London v. Cooperman, 957 A.2d 836, 843 (Conn. 2008)).[5] It is less clear whether Massachusetts courts view

---

[5] The scope of this requirement is uncertain. Noting that the UFTA's actual fraudulent conveyance provision makes no mention of the transferee's intent, see Conn. Gen. Stat. § 52-552e(a)(1), the Connecticut Appellate Court has stated that this requirement attaches only to common law claims, see, e.g., Kosiorek v. Smigelski, 54 A.3d 564, 584 (Conn. App. Ct. 2012). The Connecticut Supreme Court and the Connecticut Appellate Court, however, continue to list a showing of the transferee's intent as an element of actual fraudulent conveyance under both the UFTA and the common law. See, e.g., McKay, 211 A.3d at 38; Smith v. Marshview Fitness, LLC, 212 A.3d 767, 772 (Conn. App. Ct. 2019). Here, the plaintiff has not set forth allegations directed to WPI's knowing participation, if any, in Robert's claimed fraud. Even so, WPI has made no developed argument that she was required to do so. Thus, the issue is not before us. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

- 16 -

a transferee's knowing participation in the debtor's intentional fraud as a necessary ingredient of an actual fraudulent conveyance claim. Cf. Frank Sawyer Tr. of May 1992 v. Comm'r, 712 F.3d 597, 603, 607 (1st Cir. 2013) (indicating that section 5(a)(1) concerns transferee's intent but later suggesting transferee's knowledge of transferor's intentions is "irrelevant"); Bakwin v. Mardirosian, 6 N.E.3d 1078, 1081 n.2, 1083-85 (Mass. 2014) (holding that innocent transferees may be added as "relief defendants" in UFTA actions and affirming reconveyance order against good-faith transferee who took from transferor harboring actual fraudulent intent). The parties have done nothing to clarify this murky area of the law.

The plot thickens when we consider each state's treatment of the interplay between the UFTA and the common law. The court below deemed a choice-of-law determination necessary because (in its view) all common law fraudulent conveyance claims are preempted by the UFTA under Massachusetts law but not under Connecticut law. See Foisie, 408 F. Supp. 3d at 14. We think that the matter is more nuanced.

Contrary to the district court's assertion that Massachusetts's version of the UFTA bars all common law causes of action related to fraudulent conveyances, the Massachusetts Supreme Judicial Court (SJC) has held no more than that the UFTA "establish[es] a uniform statutory baseline for fraudulent

- 17 -

transfer actions which is supplemented by the common law unless there is an inherent conflict." Cavadi, 941 N.E.2d at 36. Although the plaintiff seems to concede that her common law claims would conflict with the UFTA and thus be preempted under Massachusetts law, her claims are presently pleaded under Connecticut law. She has not yet had the opportunity to articulate what common law causes of action she might try to pursue under Massachusetts law. To the extent that her claims might resemble reach and apply actions seeking the imposition of a constructive trust to set aside Robert's transfers to WPI for her benefit as a creditor, the SJC has indicated that such actions would be preempted by the UFTA. See id. at 34, 36, 39. Even so, the SJC has emphasized that "[a]n analysis of the circumstances in a particular case is necessary to determine whether the basis of" a particular common law claim overlaps with the UFTA. Id. at 36.

Connecticut courts take a different tack, allowing parties to pursue UFTA and common law claims simultaneously, with the possibility of securing comparatively broader remedies under the UFTA. See Lloyd's, 957 A.2d at 843. These more varied remedies are chiefly available in circumstances (not now present here) involving the transferee's reconveyance or dissipation of the transferred property. See Robinson, 830 A.2d at 1117-19 (explaining that Connecticut UFTA sometimes permits damages when transferee either reconveys property and retains no proceeds or

- 18 -

dissipates property); cf. Bakwin, 6 N.E.3d at 1085, 1093-94 (acknowledging possibility of damages in similar circumstances under Massachusetts UFTA).

For the sake of completeness, we note two other potential (but ultimately illusory) points of conflict. First, WPI asserts that a choice-of-law determination is necessary because Massachusetts, unlike Connecticut, imposes a $20,000 damages cap on a charitable organization's liability in suits arising from torts committed in the course of activity meant to further the organization's charitable goals. See Mass. Gen. Laws ch. 231, § 85K. Massachusetts courts typically style this provision as covering tortious conduct attributable to the charitable organization itself. See, e.g., Goldberg v. Ne. Univ., 805 N.E.2d 517, 521 (Mass. App. Ct. 2004). Here, however, the plaintiff alleges simply that WPI was the beneficiary of Robert's fraudulent transfers, not that WPI itself engaged in tortious conduct. At this juncture — particularly given the plaintiff's lack of any opportunity to plead her complaint under Massachusetts law and the parties' consensus at oral argument that the applicability of the statutory cap to the facts of this case is uncertain — we cannot now find a material conflict between the laws of the two interested states premised on Mass. Gen. Laws ch. 231, § 85K.

Second, a material conflict might arise if we were to credit WPI's reading of the Massachusetts Appeals Court's decision in Welford v. Nobrega, 565 N.E.2d 1239 (Mass. App. Ct. 1991), aff'd, 586 N.E.2d 970 (Mass. 1992). There, the ex-wife of the purchaser of a winning lottery ticket, bought eleven years after the couple's divorce, filed suit against her ex-husband in the probate court, asserting that she was entitled to an adjustment of alimony and support based on the lottery winnings. See Welford, 565 N.E.2d at 1240. The ex-husband's new companion (a beneficiary of the trust to which the ex-husband had assigned the ticket) retaliated by seeking a declaratory judgment in the superior court, asking that she be recognized as the co-owner of the lottery ticket. See id. at 1240-42.

After some preliminary jousting, the superior court entered summary judgment in the ex-wife's favor, declaring that the lottery winnings were the ex-husband's sole property; that they had been "in substance" assigned fraudulently to the trust; that the trust failed under a state statute governing the assignment of prize winnings to trusts; and that, therefore, the winnings were subject to any modification of the alimony and/or support that might be ordered by the probate court. Id. at 1243. The Appeals Court reversed, concluding that an uncontradicted affidavit from the ex-husband's companion established an oral

agreement between the two to share the winnings.  See id. at 1243-44, 1246.

In reviewing the superior court's finding that the ex-husband had in essence fraudulently assigned the winnings to the trust, the Appeals Court deemed the premise of this finding "faulty" because the ex-wife did not qualify as her ex-husband's creditor under the UFCA.  Id. at 1243-44.  The Appeals Court noted that although spouses may qualify as creditors with respect to transfers that occur when divorce is imminent, no Massachusetts case ever had acknowledged "that a divorced spouse seeking modification of outstanding orders long after the divorce became final is a 'creditor' entitled to challenge prior transfers of property."  Id. at 1244.  In order for the ex-wife's "continuing right to modification of support orders" to make her a creditor of her ex-husband for her lifetime, the Appeals Court reasoned, "[t]here must be special circumstances unrelated to the prior marriage."[6]  Id.

---

[6] Although the SJC affirmed the Appeals Court's decision in Welford, it did so on a narrow ground that rested on the undisputed evidence that the ex-husband and his companion were co-owners of the lottery winnings.  See Welford, 586 N.E.2d at 973-74.  The SJC stated only that it "substantially agree[d]" with the Appeals Court's reasoning and remained pointedly silent about the ex-wife's creditor status.  Id. at 972.  Understandably, then, the parties — like the district court — focus exclusively on the Appeals Court's decision.

WPI argues that Welford establishes a limitation on the UFTA's definition of "creditor" that Connecticut courts would also adopt given the materially identical statutory definition of "creditor" in both versions of the UFTA and the existence of Connecticut precedent that (like certain Massachusetts precedent) limits the circumstances under which one spouse may challenge the transfers of the other during marriage. See, e.g., Molitor v. Molitor, 440 A.2d 215, 218 (Conn. 1981); Yacobian v. Yacobian, 508 N.E.2d 1389, 1389-90 (Mass. App. Ct. 1987) (rescript). Even assuming for the sake of argument that Connecticut courts would embrace Welford — a matter on which we take no view — this would only bring the two state's laws into alignment rather than create a meaningful gulf between them.

If, however, Connecticut courts were not disposed to adopt a Welford-style limitation on the creditor status of ex-spouses, a conflict could arise. Any such conflict, though, would not be material to this case because, as the district court candidly acknowledged, see Foisie, 408 F. Supp. 3d at 17, Welford is factually distinguishable. There, the disputed assets, the supposedly fraudulent transfer of those assets, and the plaintiff's claim to the assets all came into being many years after the divorce. See Welford, 565 N.E.2d at 1240, 1243. Here, however, the disputed assets and the plaintiff's claim to those assets, as well as her right to payment based on Robert's tortious

- 22 -

activity, existed at the time of the divorce proceedings, albeit unbeknownst to her as a result of Robert's chicanery. So, too, even though the plaintiff — like the ex-wife in Welford — seeks to modify "outstanding orders long after the divorce became final," id. at 1244, her divorce settlement — unlike in Welford — was allegedly procured by fraud. And unlike in Welford, the plaintiff does not seek merely to reopen the financial aspects of her divorce but, rather, seeks as well to prosecute claims for fraud and breach of contract.

We readily acknowledge that Welford is not a model of clarity and that language in that opinion, if unmoored from the case's factual context, can be read expansively to suggest either that ex-spouses seeking modification of long-settled orders may never qualify as creditors absent special circumstances or that the transfers of a former spouse can only be challenged if they occurred while divorce proceedings were underway or imminent. See id. But this language is dictum and, in all events, we do not think that Welford's discussion of creditor status can be so easily disentangled from its unique facts. Consequently, Welford cannot form a credible basis for a claim of material conflict between Connecticut law and Massachusetts law.

The short of it is that there may be material conflicts between Connecticut law and Massachusetts law as to the elements of the plaintiff's actual fraudulent conveyance claims and the

potential preemption of her common law claims. But without further elaboration from the parties on each of these points, it is surpassingly difficult at this nascent stage of the litigation to discern the practical import of these potential conflicts. This uncertainty feeds into our principal concern: that the district court's choice-of-law determination was premature. To put this concern into perspective, we first sketch the contours of the applicable analytic framework.

When resolving disagreements about which state's law applies, we employ the choice-of-law principles of the forum state (here, Massachusetts). See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 158 (1st Cir. 2005). Massachusetts courts normally settle choice-of-law disputes using a functional approach, looking to the Restatement (Second) of Conflict of Laws as "[o]ne obvious source of guidance." Bushkin Assocs. v. Raytheon Co., 473 N.E.2d 662, 668-69 (Mass. 1985); see McKee v. Cosby, 874 F.3d 54, 59-60 (1st Cir. 2017).

At their core, fraudulent conveyance actions are both remedial in nature and auxiliary to underlying actions to recover debts (which can sound in tort, contract, or some admixture of the two). See Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.), 108 B.R. 384, 386-87 (Bankr. D. Mass. 1989); Jorden v. Ball, 258 N.E.2d 736, 737 (Mass. 1970). Regardless of the

- 24 -

particular flavor of the underlying action, it is pellucid that Massachusetts would apply the law of the state with the "most significant relationship" to the parties, the conveyances, and the creditor's underlying claims. Restatement (Second) of Conflict of Laws §§ 145, 188 (Am. Law Inst. 1971); see Brennan v. Carvel Corp., 929 F.2d 801, 806 (1st Cir. 1991); In re Morse Tool, 108 B.R. at 385; Cosme v. Whitin Mach. Works, Inc., 632 N.E.2d 832, 834-35, 834 n.3 (Mass. 1994).

In administering the "most significant relationship" test, a variety of data points must be examined. These data points include the character and site of the conveyed assets, the state (or states) from which the assets were transferred, and the whereabouts of the debtor, the creditor, and the transferee. See Murphy v. Meritor Sav. Bank (In re O'Day Corp.), 126 B.R. 370, 391 (Bankr. D. Mass. 1991); In re Morse Tool, 108 B.R. at 387-88. The analysis must also be informed by the factors enumerated in section 6 of the Restatement, including "the relevant policies of the forum" and other interested states, "the relative interests of those states in the determination of the particular issue," the need to protect the parties' "justified expectations," and "the basic policies underlying the particular field of law." Restatement (Second) of Conflict of Laws § 6(2); see Cosme, 632 N.E.2d at 835; Bushkin, 473 N.E.2d at 669.

Relative to this inquiry, the district court harvested several relevant pieces of information from the complaint and its attachments. The court noted that Robert's deception transpired during the couple's divorce proceedings in Connecticut; that the plaintiff resided in Florida at the time she filed this suit; and that Robert maintained various residences (in Nevada, Florida, and Antigua) after the divorce. See Foisie, 408 F. Supp. 3d at 14. The court acknowledged that "it is not clear from where the money was transferred" but that the plaintiff's "allegations that Robert hid money in offshore accounts" rendered it "unlikely that [the funds were] transferred from Connecticut." Id. Ultimately, the court concluded that the basic policies underlying fraudulent conveyance law — which it deemed "the most significant factor" in the choice-of-law analysis — centered on the location of the conveyed assets. Id. At the end of the day, the court applied Massachusetts law because, as it read the complaint, "the assets Janet seeks are presently located" in the Commonwealth. Id.

On this record, we conclude that the court below should not have made a choice-of-law determination at the motion-to-dismiss stage. In reaching this conclusion, we emphasize that the optimal timing for a choice-of-law determination is case-specific. In many cases, the relevant facts are sufficiently clear that delay in making a choice-of-law determination would serve no useful purpose. In such cases, the court is free to make a choice-of-

- 26 -

law determination on the basis of the plaintiff's complaint. See, e.g., Carton v. Gen. Motors Acceptance Corp., 611 F.3d 451, 454-55 (8th Cir. 2010); Bartel v. Tokyo Elec. Power Co., 371 F. Supp. 3d 769, 790 (S.D. Cal.), appeal dismissed, 2019 WL 5260743 (9th Cir. July 30, 2019) (unpublished order); Reginella Constr. Co. v. Travelers Cas. & Sur. Co. of Am., 949 F. Supp. 2d 599, 609 (W.D. Pa. 2013), aff'd, 568 F. App'x 174 (3d Cir. 2014).

In other cases, though, the record is more tenebrous, and the complaint itself leaves unanswered questions about critical aspects of the pertinent facts. In such cases, a district court is well-advised to refrain from making an immediate choice-of-law determination. After all, when there are important holes in the record, discovery will likely illuminate critical facts bearing on the unanswered questions and, thus, on the ultimate question of which state's law should apply. See, e.g., Bristol-Myers Squibb Co. v. Matrix Labs. Ltd., 655 F. App'x 9, 13 (2d Cir. 2016); Jones v. Lattimer, 29 F. Supp. 3d 5, 10 n.3 (D.D.C. 2014); Speedmark Transp., Inc. v. Mui, 778 F. Supp. 2d 439, 444 (S.D.N.Y. 2011). We think that this case falls into the latter camp.

Here, discovery may well reveal salient facts bearing on the choice-of-law calculus, such as Robert's primary residence at the time of the transfers and the geographic focal points of any relevant meetings or communications between Robert and WPI. Discovery also promises to shed light upon the types and kinds of

- 27 -

property transferred and the locations from which the disputed funds were sent to WPI. Although the district court deemed it unlikely that the funds were transferred from Connecticut, see Foisie, 408 F. Supp. 3d at 14, the complaint leaves this issue wide open. While the complaint alleges that some of the funds were held in an offshore account, Robert is also alleged to have transferred the proceeds of a gaggle of promissory notes. The complaint contains nothing to suggest where those proceeds were held at the time of the transfers. What is more, the geographic origins of the disbursements that allegedly rendered Robert insolvent — such as the transfer of funds "to WPI and/or to the government of Antigua and Barbuda" in December of 2016 — must be factored into the mix. The complaint contains no allegations about the locations from which these funds were disbursed.

To cinch the matter, the complaint alleges that "a substantial part" of the funds are now located in Massachusetts. This leaves open the possibility that other substantial portions of the disputed funds and/or parcels of as-yet unknown real property lie outside the Commonwealth (possibly in Connecticut). Given the fungibility of money and the fluidity with which it can be moved, assuming that all of the disputed funds are being held in Massachusetts comes dangerously close to applying the law of a state whose only significant relationship to the case is that it

is the transferee's principal place of business.[7] According dispositive weight to the transferee's base of operations is not encouraged by the case law. See In re O'Day Corp., 126 B.R. at 391; In re Morse Tool, 108 B.R. at 388. That is especially true where, as here, we cannot say with any assurance whether a significant portion of the disputed assets was conveyed to WPI either from Connecticut or from some other domestic locus. Indeed, we cannot even be sure, at this early stage, about precisely what types of property Robert transferred to WPI. Cf. U.S. Bank Nat'l Ass'n v. Bolling, 57 N.E.3d 1033, 1035 (Mass. App. Ct. 2016) (explaining that when claims involve real property, Massachusetts ordinarily privileges law of state where real property is located in choice-of-law calculus). To the extent that Robert transferred money to WPI, that fact might reduce the importance of the site of the transferred assets in the choice-of-law inquiry since money is difficult to pin to a single geographic location. Cf. In re Morse Tool, 108 B.R. at 387-88 (affording significant weight to location of transferred assets

_____

[7] WPI takes pains to point out that the Uniform Commercial Code (U.C.C.) expressly excludes "money" from its definition of a "general intangible." See U.C.C. § 9-102(a)(42). Regardless of the U.C.C.'s taxonomy, the practical reality remains that money is easily and frequently shifted into different shapes and forms. This means, we think, that it would be folly to assume that all of the disputed funds are located in Massachusetts merely because WPI maintains its principal place of business there.

in choice-of-law analysis where transferred assets consisted at least partially of tangible inventory).

We add, moreover, that the district court's choice-of-law determination appears to have been based on a truncated assessment of the factors limned in the Restatement. For instance, the court seems not to have analyzed the relevant policies and interests of the affected jurisdictions. See Restatement (Second) of Conflict of Laws § 6(2)(c). The court also appears not to have considered the plaintiff's justifiable expectations. See id. § 6(2)(d). Taking the totality of the relevant factors into account may well affect the outcome of the inquiry.

The upshot is that both Connecticut and Massachusetts have significant relationships to this litigation. As the factual record matures, strong arguments may well emerge for applying either state's law. Although the choice itself is not clear, what is clear is that gathering further pertinent information will assist the district court in making it. A choice-of-law determination in this type of case ought not to be made prematurely, cf. Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 201 (1st Cir. 2006) ("The oenologist's creed teaches that we should drink no wine before its time."), and we conclude that this is a situation in which a choice-of-law analysis would be better performed on a more fully developed factual record. The district

court's premature choice-of-law determination must, therefore, be set aside.

Following discovery, the district court will be better positioned to determine whether a material conflict exists between the laws of the interested states. In making this determination, we invite the district court, on a more mature record, to undertake an assessment of the elements of fraudulent conveyance claims under each state's law and to reevaluate the practical ramifications of any potential preemption of the plaintiff's common law claims. If in the end the court determines that such a conflict exists and that a choice of law is required, it should revisit the question and assess afresh which state — Connecticut or Massachusetts — possesses the most significant relationship to the plaintiff's claims. We take no view on the answer to that question.

## C.  UFTA Claims.

We turn next to the district court's dismissal of the plaintiff's UFTA claims for what the court described as lack of standing. In the court below, WPI styled its argument that the plaintiff lacked standing to sue under the UFTA under Federal Rule of Civil Procedure 12(b)(1). Arguments concerning the absence of statutory standing, unlike arguments concerning the absence of constitutional standing, do not address a court's subject matter jurisdiction but, rather, address the merits of the plaintiff's claims. See Katz v. Pershing, LLC, 672 F.3d 64, 75 (1st Cir.

2012).  Consequently, such arguments are more appropriately evaluated under the umbrella of Federal Rule of Civil Procedure 12(b)(6), see id. at 75-76, and we — like the district court, see Foisie, 408 F. Supp. 3d at 9, 15 — consider WPI's arguments concerning statutory standing under that umbrella.

We review de novo a district court's grant of a Rule 12(b)(6) motion to dismiss.  See Tambone, 597 F.3d at 441.  In undertaking this review, we accept as true all well-pleaded facts contained in the complaint and draw all reasonable inferences in the pleader's favor.  See id.  We may supplement these facts and inferences with information gathered from "matters of public record" and "facts susceptible to judicial notice."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011).  Having laid this foundation, we proceed to appraise the substance of the district court's dismissal of the plaintiff's UFTA claims.

Both the Connecticut and Massachusetts versions of the UFTA identically provide that a plaintiff must qualify as a "creditor" of the debtor who made allegedly fraudulent transfers. See Conn. Gen. Stat. §§ 52-552e(a), 52-552f(a) (delineating circumstances in which transfers by debtor are "fraudulent as to a creditor"); Mass. Gen. Laws ch. 109A, §§ 5(a), 6(a) (same). The district court viewed the matter through the prism of the Massachusetts UFTA and, extrapolating from its reading of the Massachusetts Appeals Court's decision in Welford, the district

court determined that the plaintiff did not qualify as a creditor and, thus, could not pursue UFTA claims. See Foisie, 408 F. Supp. 3d at 16-17.

Inasmuch as the Connecticut and Massachusetts versions of the UFTA identically define the term "creditor" and WPI insists that Connecticut courts would impose a Welford-type limitation on an ex-spouse's ability to qualify as a creditor, we are constrained to tackle this controversy despite the absence of a definitive choice of law. Our appraisal of the correctness vel non of the district court's determination about the plaintiff's creditor status necessarily starts with the statutory text. See Stornawaye Fin. Corp. v. Hill (In re Hill), 562 F.3d 29, 32 (1st Cir. 2009). If a statute defines a term in plain and unambiguous language, that is generally the end of the matter. See Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 8 (1st Cir. 2007). Both Massachusetts and Connecticut courts cleave to the time-honored principle that clear statutory language should generally control unless adhering to it would produce absurd, unworkable, or illogical results. See State v. Menditto, 110 A.3d 410, 413 (Conn. 2015); In re Custody of Victoria, 39 N.E.3d 418, 425 (Mass. 2015).

The UFTA defines a "creditor" simply as "a person who has a claim." Conn. Gen. Stat. § 52-552b(4); Mass. Gen. Laws ch. 109A, § 2. A "claim," in turn, is defined expansively as "a right to payment, whether or not the right is reduced to judgment,

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." Conn. Gen. Stat. § 52-552b(3); accord Mass. Gen. Laws ch. 109A, § 2. Under the statutory definition — which the district court did not analyze — the plaintiff appears at first blush to qualify as Robert's creditor. After all, she has plausibly alleged that she had a right to payment from Robert (albeit a contingent right) at the time of the transfers. This right was manifested both by her motion to reopen the divorce case and by the various tort and contract causes of action for which Robert became liable when he practiced his deception and that she eventually brought against him in a parallel civil suit. See Canty v. Otto, 41 A.3d 280, 290-91 (Conn. 2012) (explaining that creditor's claim arose on date of injury in underlying tort action); Jorden, 258 N.E.2d at 738 (deeming UFCA plaintiff a creditor based on "unperfected" and "possible" claims that "merely await[ed] some further step on her part"); Innis v. Robertson, 854 N.E.2d 105, 110 (Mass. App. Ct. 2006) (concluding that unresolved fraud claim was sufficient to make UFCA plaintiff a creditor). As the statutory definition of "claim" makes luminously clear, the plaintiff is not barred from creditor status merely because her claims are disputed or have not been reduced to judgment. See Conn. Gen. Stat. § 52-552b(3); Mass. Gen. Stat. ch. 109A, § 2.

Nor is the plaintiff precluded from creditor status because one of her claims — her claim for reallocation of the marital estate, which depends on the granting of her motion to reopen the divorce case — requires her to crack open the divorce judgment.  If unresolved civil claims (and even civil causes of action that have not yet been brought) are sufficient to confer creditor status, we can think of no persuasive reason to conclude that a claim that depends on the reopening of a divorce judgment is too speculative to invest an individual with that status.  Such claims are not anomalous:  in exercising their equitable powers, Connecticut courts "consistently have granted motions to open dissolution judgments on the basis of fraud for the limited purpose of reconsidering the financial orders."  Foisie, __ A.3d at __ [slip op. at 8, 11].  The UFTA's incorporated definitions make abundantly clear that a "claim" may be either legal or equitable in nature.  See Conn. Gen. Stat. § 52-552b(3); Mass. Gen. Laws ch. 109, § 2.

In any event, motions to reopen divorce judgments are not very different, for purposes of establishing creditor status, from unresolved civil claims.  Although the divorce judgment's current terms do not entitle the plaintiff to the desired reallocation of the marital estate, neither will she be entitled to the damages she seeks against Robert in her parallel civil suit unless and until she successfully prosecutes her

claims.  In both instances, the plaintiff must jump through various hoops before she can establish liability and gain monetary relief.  Consequently, we believe that the plaintiff's claim for reallocation of the marital estate fits within the broad confines of a "claim" under the UFTA.

We recognize, of course, that courts have imposed a few limitations on the UFTA's commodious definition of "creditor."  In Massachusetts, one such limitation is triggered when a spouse attempts to challenge as fraudulent transfers by her spousal counterpart during the currency of the marriage.  In such situations, marriage alone is not sufficient to make one a creditor of her spouse.  See Yacobian, 508 N.E.2d at 1389.  As a result, Massachusetts has thus far recognized spouses as creditors only when allegedly fraudulent transfers occurred while divorce proceedings were either ongoing or imminent.  See, e.g., Du Mont v. Godbey, 415 N.E.2d 188, 190 (Mass. 1981); McDonough v. McDonough, 769 N.E.2d 798, at *1 & n.5 (Mass. App. Ct. 2002) (unpublished table decision).  The same framework exists under Connecticut's version of the UFTA.  See, e.g., Molitor, 440 A.2d at 218 (explaining that transfers "made after notice of an actual or imminent action seeking alimony or support may be found fraudulent and set aside").

Another limitation — never expressly recognized by Connecticut courts — is exemplified by the Massachusetts Appeals

Court's decision in Welford. But in light of the factual distinctions between Welford and this case, see supra Part II(B), we do not read Welford as foreclosing the plaintiff from creditor status under the UFTA.

Shutting its eyes to the obvious import of the UFTA's definition of "creditor," WPI mounts a series of counterarguments. As an opening salvo, it emphasizes that Massachusetts and Connecticut courts have thus far only deemed spouses creditors under the UFTA when divorce was imminent at the time of the challenged transfers and that the plaintiff has failed to cite precedent recognizing an ex-spouse as a creditor under circumstances analogous to those presented here. But this dearth of on-point precedent is a two-edged sword: when a statute's plain text appears to invest a plaintiff with a right to pursue a particular claim and no on-point case law demands a contrary result, a court's inquiry ought to end. Cf. Menditto, 110 A.3d at 413 (counseling that Connecticut courts should cease further inquiry if statute's plain meaning does not produce absurd results); In re Custody of Victoria, 39 N.E.3d at 425 (explaining tenet that plain meaning of statutory text should govern unless illogical results would ensue). So it is here.

WPI has a fallback position: it strives to convince us that limiting the circumstances under which a spouse's transfers can be challenged as fraudulent to the period just before divorce

ensures that spousal fraudulent conveyance claims are sufficiently concrete. In WPI's view, spouses facing imminent divorce have concrete claims on the marital estate, whereas ex-spouses proceed on the comparatively "conjectural" basis that a court may reopen a divorce judgment. Allowing an ex-spouse to qualify as a creditor premised only on an "attenuated chance" that a court will modify a divorce judgment entered many years earlier would, WPI submits, open the floodgates to putative creditors with any asserted right to payment, no matter how speculative. We are not persuaded.

To begin, we are skeptical of WPI's characterization of the plaintiff's right to payment as based only "on the purely hypothetical possibility that she might someday convince a Connecticut court to reconsider [her] long-settled final divorce judgment." This self-serving characterization places a heavy thumb on the scale and downplays the scope of the plaintiff's underlying claims. Along with her effort to reopen the divorce case, the plaintiff is pursuing plausible claims against Robert's estate for, among other things, fraud and breach of contract. At least under Connecticut law (and likely under Massachusetts law as well), these claims arose — for purposes of establishing creditor status under the UFTA — at the time of Robert's deception in 2011 and therefore existed well before the first transfer referenced in the complaint. See Canty, 41 A.3d at 290-91; Jorden, 258 N.E.2d at 738. These claims alone are

sufficient (at this stage of the proceedings) to confer creditor status on the plaintiff.[8]

We add that it is wishful thinking for WPI to attempt to brand the plaintiff's underlying claims as "purely hypothetical" or unlikely to succeed. The UFTA casts a wide net, and its definitions of "claim" and "creditor" make crystal clear that the plaintiff's right to payment is not too speculative simply because her underlying claims are disputed or have not been reduced to judgment. See Conn. Gen. Stat. § 52-552b(3)-(4); Mass. Gen. Laws ch. 109A, § 2. Nor do we have any reason to think that her claims are doomed to fail. It is uncontested that the plaintiff secured a prejudgment remedy in her civil action against Robert — a feat that required a showing of probable cause to believe that the claims were viable. See Canty, 41 A.3d at 293. So, too, the Connecticut Supreme Court lately reversed the denial of the plaintiff's motion to substitute the executors of Robert's estate as defendants in her action to reopen the divorce case. See Foisie, __ A.3d at __ [slip op. at 2]. In that decision, the

_____

[8] WPI contends that the plaintiff cannot gain creditor status simply because she has a prospect of achieving a damages award following the entry of an order of default against the executors of Robert's estate and has secured a prejudgment remedy in her parallel civil suit upon a showing of probable cause that her claims are viable. This contention serves only to erect a straw man. The plaintiff does not argue that these facts, singly or in combination, make her a creditor but, rather, argues that the existence of her civil claims makes her a creditor. She is correct on this point.

Court observed that the parties had agreed to reopen the divorce judgment "for the limited purpose of conducting discovery regarding the plaintiff's allegations of fraud" and that Robert had stipulated that the plaintiff could show "'beyond a mere suspicion' that he had engaged in fraud." Id. at __ & n.3 [slip op. at 2 & n.3].

We are equally unconvinced by WPI's importunings that the fraudulent conveyance claims of ex-spouses are inherently more attenuated than the claims of spouses challenging transfers that take place while divorce is either ongoing or imminent. Although the right to payment asserted by a spouse facing divorce is both urgent and concrete (as the marital estate is about to be divided), this does not mean that every claim asserted by an ex-spouse is necessarily speculative. It would be perverse to interpret the UFTA's broad definition of "creditor" so that a wife would qualify if she has the good fortune of discovering her spouse's fraud before the divorce but not if her spouse was cunning enough to conceal assets during the divorce proceedings and transfer them fraudulently only after the dust had settled. Cf. Bennett v. City of Holyoke, 362 F.3d 1, 11 (1st Cir. 2004) (observing that courts should not "interpret a statute in a way that would produce an entirely illogical result").

In a last-ditch attempt to derail the plaintiff's claims, WPI contends that according the plaintiff creditor status

would undermine public policy favoring the finality of judgments generally and, in particular, the finality of divorce judgments. This contention builds on a solid foundation:  the policy favoring the finality of judgments is both sound and important.  See Comfort v. Lynn Sch. Comm., 560 F.3d 22, 26 (1st Cir. 2009) (explaining that "finality is fundamental to our judicial system"); Loughlin v. Loughlin, 910 A.2d 963, 973 (Conn. 2006) (noting "the need for finality between parties in a divorce proceeding" (quoting Delahunty v. Mass. Mut. Life Ins. Co., 674 A.2d 1290, 1298 (Conn. 1996))).  But the structure that WPI erects on this foundation is as insubstantial as a house built upon the shifting sands.  The importance of finality is in no way undercut by acknowledging an ex-spouse as a creditor based in part on claims that a stipulated divorce judgment was procured through fraud.  See Foisie, __ A.3d at __ [slip op. at 8-9] ("Allowing parties to open dissolution judgments, when financial fraud has been alleged, for the limited purpose of reconsidering the financial orders . . . is both equitable and sound public policy.").  And at any rate, the principal concern with respect to the finality of divorce judgments is the need to eliminate doubt about an individual's marital status.  See Loughlin, 910 A.2d at 973.  This concern is not implicated where, as here, the plaintiff seeks to reopen the divorce case for the sole purpose of securing a new allocation of

the marital estate.  See Foisie, __ A.3d at __ [slip op. at 8-9, 13].

To say more about the UFTA claims would be pointless. The bottom line is that the plaintiff qualifies as a creditor within the purview of the UFTA in light of her nonfrivolous claims against Robert's estate.  Hence, the district court erred by dismissing the plaintiff's UFTA claims on the basis that she lacked standing as a creditor.

### D.  Common Law Claims.

This leaves the plaintiff's common law fraudulent conveyance claims.  Those claims need not detain us.  Our conclusion that the district court's choice-of-law determination must be set aside, see supra Part II(B), erodes the foundation for the court's dismissal of the plaintiff's common law claims. After all, the court premised that dismissal on its conclusion that those claims were preempted by the UFTA under Massachusetts law.  See Foisie, 408 F. Supp. 3d at 14.  Because the district court must reevaluate whether a formal choice of law is necessary and, if so, which state's law applies, the dismissal of the plaintiff's common law claims on preemption grounds cannot stand.

### E.  Adequacy of the Complaint.

We have one hill left to climb.  WPI asserts that even if the plaintiff qualifies as a creditor, dismissal of her UFTA claims is nonetheless warranted due to her failure to plead those

claims with the requisite specificity. It advances essentially the same assertion with respect to the plaintiff's common law claims. Although the district court rejected these assertions, see id. at 15, we are free to affirm the dismissal of the plaintiff's claims on any ground made manifest by the record. See Keach v. Wheeling & Lake Erie Ry. Co. (In re Montreal, Me. & Atl. Ry.), 888 F.3d 1, 8 n.4 (1st Cir. 2018).

Generally, a civil complaint must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); see Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 567-68, 570 (2007). Complaints alleging fraud, though, are subject to a heightened pleading standard, which is embodied in Federal Rule of Civil Procedure 9(b). That rule demands that the "circumstances constituting fraud" be pleaded "with particularity." Fed. R. Civ. P. 9(b); see Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 15 (1st Cir. 2004). We have explained that when Rule 9(b) applies, the pleader ordinarily must "specify the who, what, where, and when" regarding the alleged fraud. Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004). Other facets of fraud, such as intent, may be pleaded in general terms. See Fed. R. Civ. P. 9(b); Rodi, 389 F.3d at 15. Under our jurisprudence, Rule 9(b)'s heightened pleading requirements apply not only to claims of fraud simpliciter but

also to related claims as long as the central allegations of those claims "effectively charge fraud." Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 21-22 (1st Cir. 2017) (quoting N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 15 (1st Cir. 2009)).

WPI posits that Rule 9(b)'s particularity requirements apply to all of the plaintiff's fraudulent conveyance claims. Whether and to what extent Rule 9(b) applies to fraudulent conveyance claims, brought under either the UFTA or the common law, is a matter of some uncertainty — and it is a matter that we have never squarely addressed. At least one of our sister circuits has applied Rule 9(b) to fraudulent conveyance claims to the extent that such claims allege that the transferor acted with the intent to hinder, delay, or defraud the plaintiff. See Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 56 (2d Cir. 2005). But whether Rule 9(b)'s particularity requirements apply to claims of fraudulent transfer alleging only that the transferor received no "reasonably equivalent value in exchange for the transfer," Conn. Gen. Stat. § 52-552e(a)(2); Mass. Gen. Laws ch. 109A, § 5(a)(2), or to analogous claims of constructive fraudulent transfer, see Conn. Gen. Stat. § 52-552f; Mass. Gen. Laws ch. 109A, § 6, presents a more complex question. Such claims are predicated on a theory of "implied fraudulent intent," Cavadi, 941 N.E.2d at 33, and at least one circuit has

- 44 -

expressed reservations about applying Rule 9(b)'s requirements in that situation, see Life Partners Creditors' Tr. v. Cowley (In re Life Partners Holdings, Inc.), 926 F.3d 103, 120 (5th Cir. 2019). Two other circuits, though, have not hesitated to do so. See Stoebner v. Opportunity Fin., LLC, 909 F.3d 219, 225, 226 n.6 (8th Cir. 2018); Gen. Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1078-79 (7th Cir. 1997).

We need not probe these points too deeply. We think it evident that even if we assume (without deciding) that Rule 9(b) applies across the board to claims of actual and constructive fraudulent conveyance, it would require only that a plaintiff specify in sufficient detail the who, what, where, and when of the challenged transfers. See Alt. Sys. Concepts, 374 F.3d at 29. Rule 9(b)'s particularity requirements simply have no bearing with respect to the other pertinent elements of fraudulent conveyance claims, such as whether the debtor made the transfers with actual fraudulent intent; whether the debtor made the transfers without receiving reasonably equivalent value; or whether the debtor was insolvent at the time of the transfers or rendered insolvent by them. Those elements do not fall within the "who, what, where, and when" taxonomy. Accordingly, allegations with respect to those elements need only comply with the plausibility standard that customarily controls the adequacy of pleadings. See Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 567-68, 570.

Against this backdrop, we proceed to inspect WPI's compendium of supposed pleading deficiencies. At the outset, WPI suggests that the plaintiff has failed to spell out the who, what, where, and when of the alleged fraudulent transfers with sufficient particularity. This suggestion overlooks (or at least undervalues) the painstaking detail in which the complaint depicts Robert's alleged fraud. This detail includes each instance of Robert's claimed deception and the specific assets he is said to have concealed.

In addition, the complaint contains specific allegations about Robert's transfers to WPI that are sufficient to pass through the Rule 9(b) screen. These allegations touch upon the "who," indicating that Robert and WPI were the protagonists in the transfers; the "where," indicating that the funds were transferred to WPI and/or the government of Antigua and Barbuda for WPI's benefit, with at least some portion of the funds ending up in Massachusetts; and the "what" and "when," indicating that Robert donated at least $39,000,000 to WPI following the 2011 divorce, including roughly $4,500,000 from the Vaduz Trust in March of 2016, $3,000,000 from the promissory notes between December of 2015 and December of 2016, and some portion of the remainder of the claimed $31,500,000 from and after that time (when Robert allegedly started funding "unlimited" scholarships for Antiguan students).

To be sure, the plaintiff has not alleged each and every scrap of information relating to Robert's transfers to WPI. The complaint does not specify, for example, whether Robert transferred the remainder of the $39,000,000 pledge to WPI in December of 2016 or whether additional transfers had to be made. In a similar vein, the complaint does not delineate who at WPI may have negotiated or facilitated Robert's various transfers, the locations from which the funds were transferred, the sites of any meetings between Robert and representatives of WPI, or the particular means used to effectuate the transfers. But Rule 9(b) does not demand a blow-by-blow account; as long as a plaintiff has adequately pleaded the who, what, where, and when of the alleged fraudulent conduct, the rule does not obligate her to allege every conceivable detail incident to the fraud. See Dumont v. Reily Foods Co., 934 F.3d 35, 38-39 (1st Cir. 2019). This principle applies with special force when — as in this case — the plaintiff's claims concern transactions between the defendant and a third party and many, if not all, of the facts missing from the complaint are in the exclusive possession of those other parties. See Corley v. Rosewood Care Ctr., Inc. of Peoria, 142 F.3d 1041, 1051 (7th Cir. 1998); see also Alt. Sys. Concepts, 374 F.3d at 29 n.4 (citing Corley as example of "extraordinary circumstances" that might warrant relaxation of Rule 9(b) requirements). And this is all the more true when — as in this case — the missing details

are "either irrelevant or the potential subjects of discovery." Dumont, 934 F.3d at 39.

To sum up, the primary purposes undergirding Rule 9(b) are "to place the defendants on notice and enable them to prepare meaningful responses," "to preclude the use of a groundless fraud claim as a pretext to discovering a wrong," and "to safeguard defendants from frivolous charges which might damage their reputations." New Eng. Data Servs., Inc. v. Becher, 829 F.2d 286, 289 (1st Cir. 1987); see Dumont, 934 F.3d at 39. Here, the complaint contains enough factual detail to make it apparent that the plaintiff's claims are far from "groundless." New Eng. Data Servs., 829 F.2d at 289. And notwithstanding its insistence on more granular detail, WPI nowhere contends that the complaint's allegations are so vague as to inhibit its ability to file a responsive pleading. Given the totality of the circumstances, we hold that the plaintiff's allegations about the fraudulent transfers are sufficiently detailed to satisfy Rule 9(b).

Relatedly, WPI argues that the plaintiff has failed to state claims for actual fraudulent conveyances because she does not adequately allege fraudulent intent. Rule 9(b) itself rebuffs this argument: it specifically provides that averments of fraudulent intent "may be alleged generally." Fed. R. Civ. P. 9(b); see Rodi, 389 F.3d at 15. The plaintiff's allegations easily pass muster under this standard. She alleges that Robert made the

- 48 -

various transfers to WPI "with the actual intent to hinder, delay, or defraud [her]"; that Robert "sought to dispose of the assets [owed to her] for a purpose of his personal preference" rather than allow the assets to fall into her hands; and that Robert sought to dispose of the assets "in a way that would not bring the existence of the undisclosed assets to [her] attention and prompt her to seek to collect on his obligation[s] to her."

In any event, fraudulent intent is notoriously difficult to prove, and the party pleading fraudulent intent is customarily permitted to rely on certain badges of fraud to fortify her case. See In re Sharp Int'l Corp., 403 F.3d at 56. Badges of fraud are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." Id. (quoting Wall St. Assocs. v. Brodsky, 684 N.Y.S.2d 244, 247 (App. Div. 1999)). The plaintiff's complaint alleges several of the badges of fraud mentioned in the UFTA. See Conn. Gen. Stat. § 52-552e(b); Mass. Gen. Laws ch. 109A, § 5(b). For instance, it furnishes detailed allegations that Robert concealed assets from the plaintiff.

In addition, the allegations of the complaint and the reasonable inferences therefrom illuminate other familiar badges of fraud. Specifically, these allegations indicate that Robert's transfers were of substantially all of his assets and rendered him insolvent. As indicated by the Agreement, Robert left the marriage

with approximately $20,000,000 in securities, parcels of real property valued at $370,000, and a cash payout of $790,000. When this total is compared to the amounts of the allegedly fraudulent transfers and the considerable debt purportedly owed to the plaintiff, it is at least plausible that Robert's aggregate transfers consumed substantially all of his assets and left him insolvent.

To cap the matter, the plaintiff plausibly alleges that Robert's transfers to WPI were made without adequate consideration. This allegation is supported by Robert's belated disclosure of the Vaduz Trust, attached to the complaint, which indicates that he received no consideration for transferring the Trust to WPI.[9]

Under siege, WPI seeks to take refuge in the proposition that the plausibility standard is not satisfied when allegations of misconduct are equally consistent with some innocent explanation. See Twombly, 550 U.S. at 567-68. It suggests that

_____

[9] WPI asseverates that another attachment to the complaint shows that Robert received consideration for the challenged transfers in the form of fulfilling his "dream of establishing a scholarship fund" for WPI students. The rub, though, is that the UFTA provides that "[v]alue is given for a transfer" only "if, in exchange for the transfer . . ., property is transferred or an antecedent debt is secured or satisfied." Conn. Gen. Stat. § 52-552d(a); Mass. Gen. Laws ch. 109A, § 4(a); see Fed. Refinance Co. v. Klock, 352 F.3d 16, 24 (1st Cir. 2003) (noting lack of precedential support for argument that "intangibles" such as "love and affection . . . may supplant money, property, or satisfaction of an antecedent debt as fair consideration" under UFCA).

in this instance there is an "obvious alternative explanation" with respect to the intent underlying Robert's transfer of the scholarship funds to WPI in December of 2016: that Robert's purpose was exclusively charitable. Id. at 567. This suggestion elevates hope over reason.

For one thing, the December 2016 transfer is not the only transfer described in the complaint, and the plaintiff plausibly alleges that Robert's earlier transfers of the Vaduz Trust and funds collected against the promissory notes were motivated by actual fraudulent intent. For another thing, the plaintiff's allegations about the December transfer chiefly concern her constructive fraudulent conveyance claims — claims that do not require proof of actual fraudulent intent. See Conn. Gen. Stat. § 52-552f(a); Mass. Gen. Laws ch. 109A, § 6(a).

Shifting gears, WPI asserts that the plaintiff has not adequately pleaded constructive fraudulent conveyance. But as we have just explained, the plaintiff has plausibly alleged both lack of adequate consideration and insolvency as badges of fraud. No more is exigible to blunt the force of WPI's assertion. See Conn. Gen. Stat. § 52-552f(a); Mass. Gen. Laws ch. 109A, § 6(a).

That ends this aspect of the matter. We hold, without serious question, that the plaintiff's UFTA and common law claims are adequately pleaded and impervious to WPI's ferocious assault.

**III. CONCLUSION**

We need go no further. Having endeavored to unravel some strands of the tangled web of facts and law in which this case is enmeshed, we remain mindful that there is more unraveling yet to be done. That additional unraveling, though, is for the district court. For the reasons elucidated above, we vacate the judgment below and remand the matter for further proceedings consistent with this opinion.

**<u>Vacated and remanded</u>**. Costs shall be taxed in favor of the plaintiff.